RICHARD D. SCHRAMM (SBN 151696)
ADAM S. JURATOVAC (SBN 295763)
EMPLOYMENT RIGHTS ATTORNEYS
1500 East Hamilton Ave., Ste. 118
Campbell, CA 95008
Tel: (408) 796-7551
Fax: (408) 796-7368

Attorneys for Plaintiff, Andrew Mattioda

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

ANDREW MATTIODA

    Plaintiff,

v.

JIM BRIDENSTINE, in his official capacity as Administrator, National Aeronautics and Space Administration; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, an Agency of the United States,

    Defendant.

Case No.:

**COMPLAINT**

DEMAND FOR JURY TRIAL

COMES NOW plaintiff ANDREW MATTIODA and alleges as follows:

**PARTIES**

1. ANDREW MATTIODA ("MATTIODA") is a resident of Santa Clara County, California. At all times relevant herein, was engaged in employment in Santa Clara County, California. At all times relevant herein, MATTIODA was an employee protected by the provisions of the Rehabilitation Act of 1973, as amended.

2. Defendant JIM BRIDENSTINE, is Acting Administrator of National Aeronautics and Space Administration. He is sued in his official capacity.

3. Defendant NATIONAL AERONAUTICS AND SPACE ADMINISTRATION ("NASA") is a federal agency that was created by the National Aeronautics and Space Act of 1958 as a purely civilian agency. Pub. L. 85-568, § 102, 72 Stat. 433.

## JURISDICTION

4. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. 1331. Jurisdiction is proper because this is an action arising under the laws of United States, specifically, Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

## VENUE

5. Venue in the above entitled court is proper pursuant to 28 U.S.C. §1391 (b) and (d) because the injuries and damages suffered by MATTIODA were the result of actions and/or inactions of defendant that occurred in Santa Clara County, California, and NASA maintained an operation in Santa Clara County at all times relevant.

## GENERAL ALLEGATIONS

6. NASA hired MATTIODA in 2000 as a Post-Doctoral Student. NASA Ames Research Center ("AMES") used MATTIODA's expertise as a contractor beginning in 2004. AMES hired MATTIODA to his current position as a Space and Planetary Scientist with the Planetary Science Branch ("SST"), Space Science and Astrobiology Division ("SS"), Science Directorate ("S"), AMES, located at Moffett Field, California in August 2007.

7. MATTIODA was diagnosed with Femoral Acetabular Impingement ("FAI") in or about 2007, a degenerative defect disability in the hips which leads to arthritis and loss of hip function. He underwent hip surgery on his right hip in 2009. MATTIODA has the same FAI issue with his left hip, but he has not had surgery on his left hip. On or around 1984, MATTIODA was diagnosed with Scheuermann's disease of his spine, which causes the vertebrae to grow unevenly and causes scoliosis of the spine. MATTIODA has also suffered from ongoing on life-long ear infections. MATTIODA has had multiple orthopedic treatments and surgeries, so that he has both substantial physical disabilities and a history of such disabilities. These disabling conditions have imposed substantial limits on one or more major life activities including walking, standing, sleeping, and moving throughout MATTIODA's employment, so that he is a person with a disability within the meaning of the Rehabilitation Act.

8. MATTIODA began seeing orthopedist, Steven Osborn, MD ("Dr. Osborn") of El Camino Hospital in Mountain View, CA in or about 2002. To help treat MATTIODA's disease, Dr. Osborn recommended MATTIODA perform daily stretching, avoid prolonged sitting, change positions frequently, conduct regular physical therapy, consistently use ice therapy, and exercise regularly. Since 2007, Dr. Osborn has written several reasonable accommodation letters for MATTIODA regarding travel upgrades. Dr. Osborn required MATTIODA to purchase a premium class airline ticket to travel for flights longer than one hour in duration.

9. MATTIODA, between hip surgeries, underwent surgery in 2010 to repair a torn labrum in his right shoulder. By 2011, MATTIODA had given notice to AMES about all his disabilities, various surgeries, and his orthopedic limitations substantially affecting his major activities of living.

10. On or about March 1, 2011, prior to the start of a meeting discussing the upcoming NWO Workshop between AMES and the Netherlands Science Organization (in the Netherlands), MATTIODA informed Dr. Timothy Lee ("Dr. Lee") about MATTIODA's travel costs to the Netherlands. MATTIODA told Dr. Lee about Dr. Osborn's and his physical therapist's recommendation that MATTIODA not engage in the travel, because of its orthopedic affects, until MATTIODA agreed to travel to the Netherlands with the proper accommodations. Dr. Lee initially agreed to the reasonable accommodation request and asked MATTIODA to find out the costs. The reasonable accommodation request was for a business class airline ticket to provide MATTIODA more leg room and the ability to move around during flight, thus limitation aggravation to MATTIODA's disabilities.

11. After MATTIODA had privately informed Dr. Lee of the cost, Dr. Lee openly discussed MATTIODA's private health conditions with others present in the conference room. Dr. Lee compared MATTIODA's disabilities to Dr. Lee's own hip issues. None of the individuals present needed to know about MATTIODA's specific disabilities. In front of others, Dr. Lee continued and asked MATTIODA about MATTIODA's hip issues, and during the exchange Dr. Lee said something to the effect that, "I don't know why you can't just tough it out or suck it up and travel coach to the meeting." MATTIODA was upset and embarrassed by these open comments denigrating MATTIODA's disability conditions.

12. On or about March 1, 2011, MATTIODA e-mailed Dr. Louis Allamandola ("Dr. Allamandola") regarding Dr. Lee's negative and non-private comments about MATTIODA's disability

1  and how MATTIODA should handle Dr. Lee. Ultimately, AMES denied MATTIODA's reasonable
2  accommodation request for a more expensive travel ticket to the Workshop in the Netherlands.
3        13.    From March 2011 to around August 2011, whenever MATTIODA requested assistance
4  from the SS Division, Dr. Lee denied the requests. Dr. Lee frequently directed derogatory comments
5  towards MATTIODA. Dr. Lee's derogatory comments were so pervasive that when Dr. Jessie Dotson
6  ("Dr. Dotson") informed MATTIODA she wanted to nominate MATTIODA for a GS-15 promotion,
7  MATTIODA asked Dr. Dotson if Dr. Lee had to approve the promotion. Dr. Dotson confirmed Dr. Lee
8  had to approve the promotion to go forward from the Division (SS) to the Directorate (S). MATTIODA
9  then said to her, "Good luck getting it [the promotion request] past him [Dr. Lee]."
10       14.    On or about August 2011, Dr. Dotson notified MATTIODA that Dr. Lee would not move
11 forward on the promotion to a GS-15 position.  Initially, Dr. Dotson said she did not know why Dr. Lee
12 had refused the promotion.  Later, Dr. Dotson stated Dr. Lee stated he did not put MATTIODA's appli-
13 cation forward because, "there were several other highly qualified candidates" and Dr. Lee "did not think
14 your application would make it." MATTIODA asked about Dr. Dotson's comment that his application
15 had to be put up more than once before it would get approved, and Dr. Dotson said, "They (SS
16 management) did not want to 'poison' the well" regarding the application by comparing MATTIODA's
17 application with other candidates' applications. This comment contradicted Dr. Dotson's earlier com-
18 ment that MATTIODA's name had to be offered several times before a promotion would occur.  MAT-
19 TIODA was offended and upset about Dr. Lee's decision to deny his promotion application, while
20 granting applications to others who had not reported disabilities or asked for accommodations.
21       15.    On or about August 9, 2011, MATTIODA sent an e-mail to Dr. Dotson and Dr. Jesse
22 Bregman ("Dr. Bregman") asking to change Divisions due to Dr. Lee's mistreatment of MATTIODA.
23       16.    On or around August 10, 2011, MATTIODA met with Dr. Lee and asked about the
24 reasons Dr. Lee had not forwarded MATTIODA's promotion application to the Directorate level. Dr.
25 Lee offered several reasons, including that MATTIODA needed to provide more lectures at conferences
26 and publish more research.  Dr. Lee's requested items are items that increase a scientist's "h-index"
27 score, a score which measures the number of published research articles, an index more valued in aca-
28 demic circles than in government service. Dr. Lee suggested MATTIODA use personal vacation time to

draft and publish research publications. It is improper for government officials to request that civil servants perform work on their vacation days. This example was but one of Dr. Lee's frequent treatment of MATTIODA differently from other scientists at AMES continuously from 2011 onward.

17. Prior to August 2011, MATTIODA had been serving as the Deputy Branch Chief for Code SSA ("Deputy Branch Chief"). MATTIODA was advised by Dr. Michael Bicay ("Dr. Bicay") Science Directorate Chief that the position of Deputy Branch Chief would help MATTIODA earn a GS-15 promotion. MATTIODA mentioned Dr. Lee's view of the Deputy Branch Chief position to Dr. Bicay. Bicay responded that Dr. Lee had an academic view and AMES was a government facility, not an academic one. MATTIODA was shocked when, during this same August 10, 2011 meeting, Dr. Lee said that MATTIODA's position as Deputy Branch Chief did not count positively towards a GS-15 promotion, even though the Deputy Branch Chief position took about a third of MATTIODA's work time. Based on this conversation, MATTIODA resigned from his position as Deputy Branch Chief. MATTIODA was stunned that managers at AMES had given him two different sets of information about the value of serving in the Deputy Branch Chief position.

18. During MATTIODA and Dr. Lee's August 10 discussion, MATTIODA also told Dr. Lee, "Tim I am getting the impression that you do not respect me or my work." Dr. Lee responded, "I don't." MATTIODA was shocked and responded "Excuse me?" Dr. Lee continued, "We all know Lou [Dr. Lou Allamandola] is doing all the work for you." When MATTIODA asked why he had said that, Dr. Lee said, "I don't think Lou would allow himself to be put on papers where he didn't do most of the work." As the senior member of their research group, Dr. Allamandola was routinely invited to be a co-author on papers. Dr. Lee told MATTIODA that if he ever wanted to be promoted or advance, MATTIODA needed to quit working with Dr. Allamandola. In shock MATTIODA again responded "Excuse me!" Dr. Lee then said, "Do you want to tell Lou or should I?" MATTIODA said he would talk to Dr. Allamandola.

19. MATTIODA was very upset when he left the meeting and told Dr. Dotson what Dr. Lee had just said. Dr. Dotson was also shocked and at first responded with, "He did not say that!" to which MATTIODA responded with, "Go ask him yourself." MATTIODA told Dr. Dotson that, based on what Dr. Lee had said, MATTIODA would step down as her Deputy Branch Chief. He then left and went to

talk with Dr. Allamandola about Dr. Lee's statements. Dr. Lee treated MATTIODA differently from other scientists at AMES. Dr. Lee's harassment of MATTIODA was continuous and pervasive.

20. In mid August 2011, MATTIODA had a telephone call with Ombudsman, Dr. James Arnold ("Dr. Arnold"). Dr. Arnold told MATTIODA, "Come in and talk to us."

21. On or about August 17, 2011, MATTIODA went to see an AMES Ombudsman, Jack Boyd. MATTIODA reviewed the series of events involving Dr. Lee. MATTIODA asked Mr. Boyd, "Is this an EEO Matter?" Mr. Boyd said, "Just let it slide" or words to that affect. Mr. Boyd recommended that MATTIODA not take any action to what MATTIODA reported as harassment.

22. On August 4, 2011, MATTIODA indicated his interest in attending the Cassini Data Analysis Program (CDAP) panel review. Dr. Max Bernstein's ("Dr. Bernstein") requested MATTIODA go to NASA Headquarters to serve on the CDAP proposal panel review. MATTIODA expressed his concern about paying for travel, due to increased costs for his reasonable accommodation needs for that travel. Dr. Bernstein indicated that he would have funds for the travel, but only if MATTIODA obtained approval from Dr. Dotson. MATTIODA then requested a reasonable accommodation upgrade from Dr. Dotson. Dr. Dotson eventually said she would support his travel, but only if MATTIODA used his grant money to pay for the reasonable accommodation. Dr. Dotson never replaced this request with a statement that AMES would pay for the accommodation.

23. On or around August 23, 2011, MATTIODA emailed Irene Salazar, Disability Program Manager at Ames' Office of Diversity and Equal Opportunity ("ODEO") a reasonable accommodation request for an upgrade to business travel class for additional leg room due to his disability. MATTIODA attached a medical letter confirming his reasonable accommodation request was based on a medical need for the reasonable accommodation.

24. On September 7, 2011, Mark Fonda, Deputy Division Chief, Space Science and Astrobiology Division, asked Benjamin Varnell if enough funding was available to provide MATTIODA with the reasonable accommodation travel upgrade. Mr. Varnell told Mr. Fonda that "There is plenty of money in the panel pot." Ultimately, the NASA Headquarters' official in charge of the CDAP proposal panel review provided the funds for the reasonable accommodation. With the reasonable accommodation provided, MATTIODA attended the CDAP proposed panel review.

25. On September 8, 2011, Yvonne Ibarra, Division Administrator, asked Mr. Fonda for a "solution" to MATTIODA's future travel requests for reasonable accommodation upgrades. Mr. Fonda told her that, "Well, he will just have to pay the extra expense [for reasonable accommodation]."

26. On or around September 16, 2011, Dr. Dotson requested MATTIODA come to her office for a "chat." Dr. Dotson instructed MATTIODA not to go to his next Conference without first telling her. Dr. Dotson said that if he made the case that reasonable accommodations were required for his job related travel, MATTIODA could "lose your job" because of the requests. Dr. Dotson told MATTIODA his accommodation requests will cause an "undue hardship" on the government, but she would approve the accommodation requests if he used his own grant money to pay for the upgrade travel requests.

27. After MATTIODA left Dr. Dotson's office, he e-mailed Ms. Salazar and asked, "In the future could you please not speak with my supervisor without talking to me first. This actually makes my situation worse." These harassing treatments of MATTIODA due to his disability were continuous and pervasive thereafter.

28. On or around September 19, 2011, MATTIODA emailed Ms. Salazar regarding a reasonable accommodation upgrade for travel. MATTIODA indicated NASA Headquarters would be open to allowing him to present via video conferencing if AMES declined the reasonable accommodation. Again, the constant message from AMES officials was to resist any financing of accommodations.

29. Around September 2011, MATTIODA requested an ergonomic chair for his office. Dr. Dotson and other AMES officials delayed their response for several months. On or around January 12, 2012, MATTIODA followed up with Dr. Dotson regarding his ergonomic chair. She then required MATTIODA to spend his own research funds to help partially pay for the ergonomic chair. On January 12, 2012, Dr. Dotson sent him an e-mail saying, "I have not been able to find any magic pots of $ that have been set aside for reasonable accommodation requests of this nature."

30. On October 29, 2011, MATTIODA spoke at a Society for the Advancement of Chicanos-Hispanics and Native Americans in Science ("SACNAS") conference. At the conference, MATTIODA asked Dr. Allamandola why he was insistent on getting a picture of MATTIODA giving a presentation. In an exasperated tone, Dr. Allamandola admitted Dr. Lee did not think MATTIODA had any involvement with the O/OREOS mission (cubesat mission), and Dr. Lee believed Dr. Erntfreund and Dr. Ricco

were the ones involved. Dr. Allamandola said he wanted the picture to highlight MATTIODA's work and convince Dr. Lee MATTIODA was working on the project.

31.  On October 31, 2011 a (O/OREOS) meeting occurred with Richard Quinn, Dr. Dotson, Dr. Bregman, Dr. Lee, and MATTIODA attending. In that meeting Dr. Lee mentioned MATTIODA stepping down as Deputy Branch Chief. In front of everyone, Dr. Lee said MATTIODA should ask NASA Headquarters for any labor funding for himself since, "You chose to step down" from the Deputy Branch Chief position. His harassing comments about MATTIODA were obviously derogatory. Dr. Lee then followed by blaming MATTIODA for not including a line item for Bob Walker's funding (a Lab Engineering Technician). MATTIODA pointed out Dr. Lee had already approved and signed off on the budget, and Dr. Lee had not mentioned any issues regarding any line items before approving the budget. Dr. Bregman came to MATTIODA's defense in that group, and said that funding the engineering tech was also "Something I could never figure out how to do" when he was the Branch Chief. When everyone had left the meeting Dr. Quinn told MATTIODA that Dr. Lee seemed to be aggravated at MATTIODA for some reason during that meeting. Dr. Lee's openly critical and derogatory comments continued as a form of harassment throughout the months and years thereafter.

32.  On or around November 10, 2011, MATTIODA received a mid-term performance review. During that review, MATTIODA described for Dr. Dotson what he felt was on-going hostile work treatment from Dr. Lee. AMES, thereafter, took no action about this complaint. MATTIODA also asked her to review his ergonomic chair request from September.

33.  On December 14, 2011 MATTIODA learned his NASA Postdoctoral Program ("NPP") candidate was rejected from the list of November 2011 selections. This NPP candidate, Dr. Aurelien Trivella was an extremely outstanding candidate. Dr. Lee headed the NPP selection committee, and the committee ranked Dr. Trivella as eighth. Dr. Lee then authorized NPP slots to the top seven ranked candidates. Dr. Dotson later told informed MATTIODA that Dr. Trivella had not been selected because he was a foreign national, which could not have been true, because foreign nationals had been previously selected for the NPP program. Dr. Dotson and Dr. Lee were both aware AMES had changed its prior rule against foreign candidates, yet they used this past rule to reject MATTIODA's NPP candidate. NPP candidates support work on a scientist's research, increase the published work from each project, and

increase the quantity of hours a scientist has to work on a particular project or proposal. This support increase the number of publications and the scientist's h-index score.

34. On December 14, 2011, MATTIODA asked Dr. Dotson why Dr. Lee was given a new NPP candidate every two years since becoming Division Chief. Her reply was, "That isn't unusual for a successful researcher." MATTIODA added, "I've only had one NPP in 10 years!" MATTIODA then recalled Dr. Lee and Dr. Dotson had previously said his number of publications needed increasing.

35. Later that day, Dr. Allamandola sent an e-mail confirming that if MATTIODA had an NPP candidate, that fact would definitely will contribute to an increase in his scientific productivity. This ongoing failure, and future failures, to assign NPP support to MATTIODA was part of the continuous and pervasive harassment he suffered at AMES.

36. In February 2012, one NPP candidate (selected from December) declined his offer to come to AMES. Instead of offering that newly opened position to the next, and 8th, ranked NPP candidate (Dr. Trivella), AMES selected a lower ranked, foreign national for the now open NPP slot.

37. In December 2012, while MATTIODA was on sick-leave and required crutches to walk from his second surgery of the year, MATTIODA attended the Division Holiday party. MATTIODA's name had been put in for the GS-15 promotion that year again. Dr. Lee approached MATTIODA and told him not to get his "hopes up" for the GS-15 promotion because MATTIODA probably would not make the promotion on his first try. Despite Dr. Lee's derogatory comment, MATTIODA was awarded the GS-15 promotion that year.

38. Around May 2013, MATTIODA met with Dr. Dotson for MATTIODA's Employee Performance Communication System ("EPCS") yearly review. MATTIODA previously had surgery related to his disabilities with complications impacting his ability to travel during the period covered by the performance review. MATTIODA told Dr. Dotson that he was concerned his travel inability related to his disability and surgery might affect his career. Dr. Dotson instructed MATTIODA not to worry about his lack of travel. But she also stated that because MATTIODA was unable to travel to conferences and presentations, she would have to lower MATTIODA's EPCS ratings. She also added, "But nobody pays attention to them [EPCS ratings]." Dr. Dotson's statement was incorrect, and in fact MATTIODA's yearly bonuses do depend on his EPCS ratings.

39. Between September 2013 and February 2014, MATTIODA proposed to put an experiment on the exposure platform of the International Space Station ("ISS"). This proposal was outside NASA's regular proposal process and was reviewed by George Nelson, Head of Technology Development at ISS. Mr. Nelson required a review by Sharon Conover, so MATTIODA asked Dr. Lee to set up a meeting with Dr. Carol Carroll (Assistant Director of Science) who also managed Ames ISS activities. Dr. Carroll eventually told MATTIODA that "line management" (including Dr. Lee) needed to advocate for the proposal to go forward. MATTIODA sent emails to Dr. Dotson, Dr. Lee and Mr. Fonda informing them of the need for line management support. Instead of supporting the project, Dr. Dotson and Dr. Lee told MATTIODA to submit yet another new proposal requiring peer review. Ultimately, the proposal died when Dr. Lee and Dr. Dotson elected not to provide support for the proposal. AMES did not treat other scientists without disabilities in this fashion regarding their proposals.

40. On or around September 2013, MATTIODA, Dr. Scott Sandford, and Dr. Allamandola met to discuss potential proposal concepts. These discussions continued through October 2013, and MATTIODA proposed a concept for the NASA NAI Cooperative Agreement Notice (CAN) - 7 project. MATTIODA met with Astronomers and arranged other meetings to discuss collaborations on his proposal. In November 2013 Dr. Sandford told MATTIODA that Dr. Lee insisted that either he (Dr. Lee) or Dr. Sandford be identified as the Principal Investigator ("PI") on the NAI CAN 7 (cycle 7) proposal, instead of MATTIODA himself. MATTIODA discussed this PI issue with Dr. Allamandola who said, "Scott [Dr. Sandford] and Tim [Dr. Lee] seem to have orchestrated a coup d'état." Because the project would have failed without either of the others being identified as the PI for the project, MATTIODA was pressured into using their names. The proposal was finally funded using Dr. Sandford as the PI.

41. On January 23, 2014, Dr. Allamandola sent an e-mail to Dr. Lee, Dr. Dotson, MATTIODA, and Dr. Christiaan Boersma stating "Andy has been trying to get a few peanuts to work in this area (chemistry on mineral surfaces) for at least five years. Apparently, the Europeans are heading into this big time. It's time we start managing up and getting HQ to wake up and send a few ^%$#$^@#@# pennies Andy's way." This e-mail confirmed a five year period in which MATTIODA's superiors had continuously been avoiding support for his scientific projects. No supporting responses came from either Dr. Lee or Dr. Dotson to Dr. Allamandola's request.

42. During summer 2014, MATTIODA requested a reasonable accommodation by using Southwest Airlines (instead of NASA's contract carrier) for his airplane flight to a STEM Camp in Oklahoma. Dr. Dotson resisted paying the additional funds for that accommodation. On or around July 9, 2014, Payam Miri wrote an E-mail to Dr. Dotson in which she stated, "Currently Andrew Mattioda [MATTIODA] travel for 07/11/14 is awaiting fund certification, however after multiple attempts requesting approval, we have not seen the approval take place. May we get a supervisor approval ... so we may get his flight ticketed?" On July, 19, 2014, after those multiple requests, Dr. Dotson finally relented and approved the reasonable accommodation for MATTIODA's Southwest airlines ticket. MATTIODA's requests for accommodation were consistently delayed or resisted by these AMES' officials.

43. In September 2014, MATTIODA noticed Dr. Amanda Cook received a brand-new electric sit/stand desk. Dr. Cook told MATTIODA, "Jessie [Dr. Dotson] bought it for me." Dr. Cook said she did not have to submit any paperwork or documentation to Dr. Dotson to obtain the desk. Dr. Cook said that when she went to Dr. Dotson, asked for the desk, "Then it showed up." MATTIODA then went to Dr. Dotson's office and also requested an electric standing/sitting desk. Dr. Dotson told him that he was required to use the written reasonable accommodation request process to get a desk. MATTIODA ultimately did receive a desk, but only after going through a written request process not demanded of other federal workers.

44. On October 30, 2014, Dr. Dotson showed her performance review to MATTIODA and presented a sheet of paper with columns. Dr. Dotson did not explain to MATTIODA how she came up with the columns or rankings in the paper. Dr. Dotson told MATTIODA that her list showed the proposal success rates of the Civil Servants in the branch, and she pointed to the lowest value on the list saying, "Do you know who this is right here?" When MATTIODA said he did not, she responded with, "It's you." She made the statement to embarrass and humiliate MATTIODA.

45. In January 2015, Dr. Dotson declined to provide MATTIODA critical support for his SIMPLEX proposal. The complex SIMPLEX mission proposal required coordination among a number of NASA Ames units and personnel, along with budgeting from multiple sources, and the proposal deadline was March 13, 2015. AMES business office normally assists putting proposals of this

magnitude together because of their complexity and size. Dr. Dotson had earlier said she would "take care" of any problems that came up. After the business office indicated they could not provide support until after February 28, 2015, instead of offering help to MATTIODA, Dr. Dotson's response was, "Oh well, they are very busy with other proposals." She then walked away and never helped on the project.

46. On March 19, 2015, MATTIODA saw an ear, nose, and throat ("ENT") doctor who discovered an ear infection and instructed MATTIODA not to fly to the 2015 ACS meeting in Denver set for March 22-26. Previously, MATTIODA had informed Dr. Dotson about his repeated ear infections. MATTIODA then called Dr. Allamandola about the situation because Dr. Allamandola was one of the conference organizers. During their discussion Dr. Allamandola admitted he had had to argue with Dr. Lee to convince him to include MATTIODA at the conference. Dr. Allamandola confirmed Dr. Lee had suggested in other meetings that Dr. Lee (a) did not respect MATTIODA's work, (b) thought MATTIODA was lazy, and (c) believed MATTIODA was using his medical and disability issues to avoid work. When MATTIODA later proposed to do a video presentation to the conference, Dr. Lee lied and said the ACS organization did not permit video conferencing.

47. On or around May 5, 2015, Dr. Dotson conducted MATTIODA's EPCS performance review, during which she critically asked, "I need to know if you are still committed to being a high-profile scientist at NASA!" MATTIODA was embarrassed and humiliated by the question. He asked Dr. Dotson to explain her comment, and she first mentioned MATTIODA's non-attendance at the 2015 ACS meeting. She added that MATTIODA had failed to present at that ACS meeting (which had been caused by Dr. Lee's misrepresentation regarding a video presentation). MATTIODA reminded Dr. Dotson that MATTIODA's doctor had ordered him not to fly at all due to a medical condition. This instance was one of several, in which Dr. Dotson linked MATTIODA's job performance rating to his medical conditions and disabilities, and followed MATTIODA's previously telling Dr. Dotson that his travel was limited because of his bone ossification issues.

48. During that same May meeting, Dr. Dotson lowered MATTIODA's rating because he "failed" to submit the SIMPLEX proposal. MATTIODA was shocked at the comment because she had previously told MATTIODA that not submitting the SIMPLEX proposal was the "right thing to do." When MATTIODA asked if he should have submitted a proposed doomed to failure, just to be able to

say he submitted a proposal, Dr. Dotson said she never suggested that. When MATTIODA asked, "Then what are you suggesting?" she did not respond at all.

49. For the EPCS performance rating, Dr. Dotson ignored MATTIODA's proposals on several instrument developments and his scientific invitations to become a speaker. Those items should have increased MATTIODA's EPCS rating, but Dr. Dotson did not increase the rating based on those contributions. Dr. Dotson eventually relented, and admitted the SIMPLEX proposal should have been "neutral" or had no impact on MATTIODA's rating. MATTIODA then requested a Reconsideration to his rating.

50. On July 28, 2015, Dr. Dotson told MATTIODA she had rejected MATTIODA's reconsideration request regarding his performance rating. Dr. Dotson then required MATTIODA sign and date her rejection letter. Her demand was harassing because the agency's regulations required Dr. Dotson, not MATTIODA, to sign that form. He had never before been required to sign such a rejection letter. Even the e-mail from Braxton Toy, HR Specialist, mandated only Dr. Dotson's signature, not MATTIODA's. This demand to sign was both demeaning and offensive, and was part of the continuous harassment pattern MATTIODA had been experiencing for some time.

51. On July 30, 2015, due to the continued harassment and discrimination MATTIODA e-mailed Dr. Bicay requesting a job transfer, with the possibility of transferring from the SSA branch and SS Division but maintaining his current lab instrumentation and work space. Dr. Bicay responded that such a transfer was feasible but awkward, "Let's talk about it; I believe I am aware of the issues – at some level." MATTIODA was surprised by Dr. Bicay's comment, thinking, "How are you [Dr. Bicay] aware of the issues, and why haven't you done anything to resolve the situation?"

52. On August 4, 2015 MATTIODA met with Dr. Bicay to discuss the transfer and change in divisions. MATTIODA told Dr. Bicay about the discrimination, harassment, and retaliation events from 2011 to the present. Dr. Bicay asked, "Do you feel like you are being harassed and discriminated against?" Since every issue he had experienced had been based on his health issues/disabilities, MATTIODA said, "Yes," MATTIODA then asked Dr. Bicay what he meant with his e-mail message, "I believe I am aware of the issues…" Dr. Bicay then admitted he had heard rumors about MATTIODA's problems with Dr. Dotson and Dr. Lee. Dr. Bicay added that MATTIODA should meet with Dr. Arnold,

an ombudsman, for his evaluation of the situation. To MATTIODA's knowledge, other than this suggestion about Dr. Arnold, Dr. Bicay did nothing to respond to MATTIODA's report of illegal discrimination and harassment.

53. On August 7, 2015. MATTIODA met with Dr. Arnold. MATTIODA detailed the background and facts regarding his disability, failed reasonable accommodations, and what he considered to be illegal harassment. MATTIODA was surprised when Dr. Arnold responded with, "I have nothing but the highest respect for her [Dr. Dotson]." The manner of Dr. Arnold's comment suggested he already believed Dr. Dotson was not guilty of any type of harassment, discrimination, or retaliation. Dr. Arnold then suggested MATTIODA, Dr. Lee and Dr. Dotson meet together about the issues. MATTIODA said he would agree to such a meeting if he believed only one or two events had occurred and his superiors were completely unaware of what they were doing. Despite the facts, though, MATTIODA agreed to a meeting.

54. On August 21, 2015. MATTIODA conducted a follow-up meeting with Dr. Bicay and mentioned possibly going to the union or EEO, Dr. Bicay said MATTIODA would achieve better results "going the EEO route." MATTIODA then made his informal contact with Ms. Salazar, informing her that he wanted to file an informal complaint of discrimination, reprisal, and harassment based on actions that had been continuous and either severe or pervasive over many years.

55. On August 24, 2015. MATTIODA met with Dr. Janice Fried (AMES Anti-harassment coordinator) and provided the information for his harassment and retaliation complaint. Dr. Fried admitted that it was very difficult to prove harassment using NASA's policies and procedures.

56. On September 15, 2015. Farzana Moreno (travel lead at AMES) sent an e-mail stating NASA had revised its requirements for travel upgrades when based on disabilities or special needs. Her e-mail message was published on September 18, 2015. The new requirements specified each AMES manager was required to use certain text when approving a reasonable accommodation travel request. That text was: "An accommodation for traveler [name] has been granted by me, for [type-coach upgrade, business, first] class travel, for [length – x month, or permanent] duration." This requirement did not require (a) a fund manager's written approval or (b) the employee's not-to-exceed-budget.

//

57. During the September 13-17, 2015 period, MATTIODA was an invited speaker at a symposium to honor Lou Allamandola's contributions to molecular science. After MATTIODA's presentation, Dr. Annemieke Petrignani and Dr. Alessandra Candian from the Netherlands, approached MATTIODA about possibly collaborating on research involving the overtone and combination bands of PAHs. Neither mentioned ever speaking to Dr. Lee regarding this topic, or any topic.

58. On October 13, 2015 MATTIODA gave an invitational lecture to the Astrochemistry School held at the SETI Institute in Mountain View. Because of this lecture, Dr. Xinchuan Huang (Dr. Lee's postdoctoral fellow) contacted MATTIODA to discuss the possibility of collaborating with Dr. Petrignani and Dr. Candian. MATTIODA responded saying he had already discussed this possibility with the two researchers in September. MATTIODA then learned Dr. Lee had falsely claimed that he, Dr. Lee, was the one who spoke with the two researchers regarding a collaboration with MATTIODA.

59. By November 16, 2015, AMES had not resolved the informal complaint of discrimination, harassment, and reprisal that MATTIODA had filed in August 2015. As a result, MATTIODA filed a timely formal complaint against the agency. In fact, during the agency's 2016 formal investigation into the matter, AMES continued to engage in discrimination, harassment, and reprisal as the events of 2016 showed.

60. On January 19, 2016, Dr. Michael Bicay sent MATTIODA an e-mail stating he did not find that NASA's NPR 3717.3 policy or NASA's Anti-Harassment Policy had been violated. However, Dr. Bicay asked that MATTIODA's first and second line supervisors ensure MATTIODA is provided with flexibility in his work schedule. Dr. Bicay also stated that he would instruct MATTIODA's first and second line supervisors to provide reasonable work accommodations necessary for MATTIODA to remain a productive researcher at AMES.

61. On January 26, 2016, two colleagues Dr. Lee reported to MATTIODA that Dr. Lee had made unprofessional comments regarding MATTIODA. The two colleagues said, "We know he [Dr. Lee] doesn't like you." The two colleagues then told MATTIODA that at a dinner after an international conference session, Dr. Lee said, "Andy [MATTIODA] is a Deputy Branch Chief because he can't get any funding on his own." Later during that dinner, when other scientists suggested involving MATTIODA in a research project, Dr. Lee stated, "Good luck getting him [MATTIODA] to do anything." By

these comments, Dr. Lee implied MATTIODA was lazy, amongst other things. When MATTIODA asked why they had not mentioned the comments before, they replied that Dr. Lee had made such comments so often, that the comments about MATTIODA just became "background noise" to them.

62. On February 4, 2016, Dr. Boersma and MATTIODA met with Dr. Lee and his postdoctoral fellow, Dr. Huang. Based on previous exchanges with Dr. Huang, MATTIODA had initiated the meeting to discuss potentially collaborating on a project. Dr. Boersma and MATTIODA presented their concept to Dr. Huang and Dr. Lee. After the presentation, Dr. Lee made it clear that Dr. Lee was not interested in collaborating with MATTIODA and Dr. Boersma on that project. Dr. Lee stated that Dr. Boersma and MATTIODA were free to collaborate with other people.

63. MATTIODA has thus filed a timely informal charge, a timely informal charge, and permitted the agency to engage in more than 180 days of investigation before bringing this matter to court. As a result, MATTIODA has exhausted all administrative remedies needed to timely bring this complaint against Defendant.

## COUNT ONE

### Disability Discrimination and Harassment

### THE REHABILITATION ACT OF 1973: SECTION 501

64. MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

65. The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years (including with respect to evaluations and promotions), and directing adverse treatment against him because of his disability conditions, constitute discrimination and harassment because of disability in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

66. The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant. The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disabilities

was continuous and pervasive.

67. As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT TWO

### Failure To Engage in the Interactive Process

### THE REHABILITATION ACT OF 1973: SECTION 501

68. MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

69. The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years (including denying requested reasonable accommodations), and providing adverse treatment instead of providing reasonable accommodation were all because of his disability conditions, all constitute discrimination and continuous failures to accommodate his disabilities in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

70. The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant. The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

71. As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT THREE

### Reprisal

### THE REHABILITATION ACT OF 1973: SECTION 501

72. MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

73. The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years, and directing adverse treatment against him were effected in part because of MATTIODA's objections to illegal discrimination and harassment, including his demands for reasonable accommodation and funding, and and therefore violate Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

74. The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant. The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

75. As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

### PRAYER

ANDREW MATTIODA prays for judgment as follows:

1. Compensatory damages according to proof, including wage loss, benefits, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial in an amount of $300,000, exclusive of lost wages;

//

2. Reasonable attorneys fees pursuant to Section 505(b) of the Rehabilitation Act of 1973, 29 U.S.C. §794a(b) attorneys fees and costs of suit;

4. Pre- and Post- Judgment Interest;

5. Such other and further relief as this court may deem just and proper.

DATED: June 2, 2020

/s/
ADAM S. JURATOVAC, Esq.
EMPLOYMENT RIGHTS ATTORNEYS
Attorneys for Plaintiff, ANDREW MATTIODA

**DEMAND FOR JURY TRIAL**

MATTIODA demands a trial by jury on all claims alleged herein and via amended pleadings, if any.

DATED: June 2, 2020

/s/
ADAM S. JURATOVAC, Esq.
EMPLOYMENT RIGHTS ATTORNEYS
Attorneys for Plaintiff, ANDREW MATTIODA