RICHARD D. SCHRAMM (SBN 151696)
ADAM S. JURATOVAC (SBN 295763)
EMPLOYMENT RIGHTS ATTORNEYS
1500 East Hamilton Ave., Ste. 118
Campbell, CA  95008
Tel:  (408) 796-7551
Fax: (408) 796-7368

Attorneys for Plaintiff,
Andrew Mattioda

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW MATTIODA, | Case No.: 20-03662-SVK |
| Plaintiff, | **COMPLAINT** |
| v. | Consolidated Case No. 20-03662-SVK |
| JIM BRIDENSTINE, in his official capacity as Administrator, National Aeronautics and Space Administration; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, an Agency of the United States, | (Case No. 20-03745) |
| | (Case No. 20-03849) |
| | (Case No. 20-04457) |
| Defendants. | DEMAND FOR JURY TRIAL |

COMES NOW plaintiff ANDREW MATTIODA and alleges as follows:

## PARTIES

1.      ANDREW MATTIODA ("MATTIODA") is a resident of Santa Clara County, California. At all times relevant herein, he was engaged in employment in Santa Clara County, California.  At all times relevant herein, MATTIODA was an employee protected by the provisions of the Rehabilitation Act of 1973, as amended.

2.      Defendant JIM BRIDENSTINE, is Acting Administrator of National Aeronautics and Space Administration. He is sued in his official capacity.

3.      Defendant NATIONAL AERONAUTICS AND SPACE ADMINISTRATION ("NASA") is a federal agency that was created by the National Aeronautics and Space Act of 1958 as a purely civilian agency. Pub. L. 85-568, § 102, 72 Stat. 433.

**JURISDICTION**

4.      This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. 1331. Jurisdiction is proper because this is an action arising under the laws of United States, specifically, Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

**VENUE**

5.      Venue in the above entitled court is proper pursuant to 28 U.S.C. §1391 (b) and (d) because the injuries and damages suffered by MATTIODA were the result of actions and/or inactions of defendant that occurred in Santa Clara County, California, and NASA maintained an operation in Santa Clara County at all times relevant.

**GENERAL ALLEGATIONS APPLICABLE TO ALL COMPLAINTS**

6.      NASA hired MATTIODA in 2000 as a Post-Doctoral Student. NASA Ames Research Center ("AMES") used MATTIODA's expertise as a contractor beginning in 2004. AMES hired MATTIODA to his current position as a Space and Planetary Scientist with the Planetary Science Branch ("SST"), Space Science and Astrobiology Division ("SS"), Science Directorate ("S"), AMES, located at Moffett Field, California in August 2007.

7.      MATTIODA was diagnosed with Femoral Acetabular Impingement ("FAI") in or about 2007, a degenerative defect disability in the hips which leads to arthritis and loss of hip function.   He underwent hip surgery on his right hip in 2009.  MATTIODA has the same FAI issue with his left hip. On or around 1984, MATTIODA was diagnosed with Scheuermann's disease of the spine, which causes the vertebrae to grow unevenly and causes scoliosis of the spine.  MATTIODA has also suffered from ongoing on life-long ear infections.  MATTIODA has had multiple orthopedic treatments and surgeries, so that he has both substantial physical disabilities and a history of such disabilities. Throughout the time of MATTIODA's employment, these disabling conditions have imposed substantial limits on one or more major life activities including walking, standing, sleeping, and moving so that he is a person with a disability within the meaning of the Rehabilitation Act.

8.     MATTIODA began seeing orthopedist, Steven Osborn, MD ("Dr. Osborn") of El Camino Hospital in Mountain View, CA in or about 2002. To help treat MATTIODA's disease, Dr. Osborn recommended MATTIODA perform daily stretching, avoid prolonged sitting, change positions frequently, conduct regular physical therapy, consistently use ice therapy, and exercise regularly. Since 2007, Dr. Osborn has written several reasonable accommodation letters for MATTIODA regarding travel upgrades. Dr. Osborn required MATTIODA to purchase a premium class airline ticket to travel for flights longer than one hour in duration.

9.     MATTIODA, between hip surgeries, underwent surgery in 2010 to repair a torn labrum in his right shoulder.  By 2011, MATTIODA had given notice to AMES about all his disabilities, various surgeries, and his orthopedic limitations substantially affecting his major activities of living.

## GENERAL ALLEGATIONS FROM FIRST FILED COMPLAINT

10.     On or about March 1, 2011, prior to the start of a meeting discussing the upcoming NWO Workshop between AMES and the Netherlands Science Organization (in the Netherlands), MATTIODA informed Dr. Timothy Lee ("Dr. Lee") about MATTIODA's travel costs to the Netherlands.  MATTIO-DA told Dr. Lee about Dr. Osborn's and his physical therapist's joint recommendation that MATTIODA not engage in the travel, because of its orthopedic affects, unless MATTIODA traveled to the Nether-lands with the proper accommodations.  Dr. Lee initially agreed to the reasonable accommodation request and asked MATTIODA to determine costs.  The reasonable accommodation request was for a business class airline ticket to provide MATTIODA more leg room and the ability to move around during flight, thus limiting aggravation to MATTIODA's disabilities.

11.     After MATTIODA privately informed Dr. Lee of the cost, Dr. Lee openly discussed MATTIODA's private health conditions with others present in the conference room.  Dr. Lee compared MATTIODA's disabilities to Dr. Lee's own hip issues.  None of the individuals present needed to know about MATTIODA's specific disabilities. In front of others, Dr. Lee asked MATTIODA about his hip issues, and during the exchange Dr. Lee said something to the effect that, "I don't know why you can't just tough it out or suck it up and travel coach to the meeting."  MATTIODA was upset and embarrassed by these open comments denigrating MATTIODA's disability conditions.  This comment began a series of harassing comments and events that accumulated and became pervasive over time.

12.     On or about March 1, 2011, MATTIODA e-mailed Dr. Louis Allamandola ("Dr. Allamandola") regarding Dr. Lee's negative and non-private comments about MATTIODA's disability and how MATTIODA should handle Dr. Lee. Ultimately, AMES denied MATTIODA's reasonable accommodation request for a more expensive travel ticket to the Netherlands.

13.     From March 2011 to around August 2011, whenever MATTIODA requested assistance from the SS Division, Dr. Lee denied the requests. Dr. Lee frequently directed derogatory comments towards MATTIODA. Dr. Lee's derogatory comments were so pervasive that when Dr. Jessie Dotson ("Dr. Dotson") informed MATTIODA she wanted to nominate MATTIODA for a GS-15 promotion, MATTIODA asked Dr. Dotson if Dr. Lee had to approve the promotion. Dr. Dotson confirmed Dr. Lee had to give approval for the promotion to go forward.  MATTIODA then told her, "Good luck getting it [the promotion request] past him [Dr. Lee]."

14.     On or about August 2011, Dr. Dotson notified MATTIODA that Dr. Lee would not move forward on the promotion to a GS-15 position.  Initially, Dr. Dotson said she did not know why Dr. Lee had refused the promotion.  Later, Dr. Dotson stated Dr. Lee claimed he did not put MATTIODA's application forward because, "There were several other highly qualified candidates" and Dr. Lee "did not think your application would make it." MATTIODA asked about Dr. Dotson's comment that his application had to be put up more than once before it would get approved, and Dr. Dotson said, "They (SS management) did not want to 'poison' the well" regarding the application by comparing MATTIODA's application with other candidates' applications. This comment contradicted Dr. Dotson's earlier comment that MATTIODA's name had to be offered several times before a promotion would occur.  MATTIODA was offended and upset about Dr. Lee's decision to deny his promotion application, while granting applications to others who had not reported disabilities or asked for accommodations.

15.     On or about August 9, 2011, MATTIODA sent an e-mail to Dr. Dotson and Dr. Jesse Bregman ("Dr. Bregman") asking to change Divisions due to Dr. Lee's mistreatment of MATTIODA.

16.     On or around August 10, 2011, MATTIODA asked Dr. Lee and about the reasons Dr. Lee had not forwarded MATTIODA's promotion application to the Directorate level. Dr. Lee offered several reasons, including that MATTIODA's alleged need to provide more lectures at conferences and publish more research.  Dr. Lee's requested items are items that increase a scientist's "h-index" score, a score

1  which measures the number of published research articles, an index more valued in academic circles and

2  generally not applicable in government service.  Dr. Lee suggested MATTIODA use personal vacation

3  time to draft and publish research publications.  It is improper for officials to request that civil servants

4  perform work on their vacation days.  This example was but one of Dr. Lee's frequent treatment of

5  MATTIODA differently from other scientists at AMES continuously from 2011 onward.

6      17.    Before August 2011, MATTIODA had been serving as Deputy Branch Chief for Code

7  SSA ("Deputy Branch Chief").  MATTIODA was advised by Dr. Michael Bicay ("Dr. Bicay") Science

8  Directorate Chief that the position of Deputy Branch Chief would help MATTIODA earn a GS-15

9  promotion.  MATTIODA mentioned Dr. Lee's view of the Deputy Branch Chief position to Dr. Bicay.

10 Bicay responded that Dr. Lee had an academic view and AMES was a government facility, not an

11 academic one.  MATTIODA was shocked when, during this August 10, 2011 meeting, Dr. Lee said that

12 MATTIODA's position as Deputy Branch Chief did not count positively towards a GS-15 promotion,

13 even though the Deputy Branch Chief position took a third of MATTIODA's work time.  Based on this

14 conversation, MATTIODA resigned from his position as Deputy Branch Chief.  He was stunned that

15 managers had given two different sets of information about serving in the Deputy Branch Chief position.

16     18.    During MATTIODA and Dr. Lee's August 10 discussion, MATTIODA also said, "Tim I

17 am getting the impression that you do not respect me or my work," to which Dr. Lee responded, "I

18 don't."  MATTIODA was shocked, and Dr. Lee continued with, "We all know Lou [Dr. Lou Allaman-

19 dola] is doing all the work for you."  When MATTIODA asked why he had said that, Dr. Lee said, "I

20 don't think Lou would allow himself to be put on papers where he didn't do most of the work."  As the

21 senior member of their research group, Dr. Allamandola was routinely invited to be a co-author on

22 papers.  Dr. Lee told MATTIODA that if he ever wanted to be promoted or advance, he needed to quit

23 working with Dr. Allamandola.

24     19.    MATTIODA was very upset when he left the meeting and told Dr. Dotson what Dr. Lee

25 had just said. Dr. Dotson was also shocked and at first responded with, "He did not say that!" to which

26 MATTIODA responded with, "Go ask him yourself."  MATTIODA said that, based on what Dr. Lee had

27 said, he would step down as her Deputy Branch Chief.  He then went and talked with Dr. Allamandola

28 about Dr. Lee's statements.  These were additional examples of harassment against MATTIODA.

20.     In mid August 2011, MATTIODA had a telephone call with Ombudsman, Dr. James Arnold ("Dr. Arnold"). On or about August 17, 2011, MATTIODA then went to see an AMES Ombudsman, Jack Boyd.  MATTIODA reviewed the series of events involving Dr. Lee.  MATTIODA asked Mr. Boyd, "Is this an EEO Matter?" to which Mr. Boyd responded, "Just let it slide" or words to that affect. Mr. Boyd recommended MATTIODA not take any action to what he reported as harassment.

21.     On August 4, 2011, MATTIODA indicated his interest in attending the Cassini Data Analysis Program (CDAP) panel review.  Dr. Max Bernstein's ("Dr. Bernstein") requested MATTIODA go to NASA Headquarters to serve on the CDAP proposal panel review. MATTIODA expressed his concern about paying for travel, due to increased costs for his travel's reasonable accommodation needs. Dr. Bernstein indicated he would have funds for the travel, but only if MATTIODA obtained approval from Dr. Dotson. MATTIODA then requested a reasonable accommodation upgrade from Dr. Dotson who eventually said she would support this travel, but only if MATTIODA used his own grant money to pay for the accommodation.  Dr. Dotson never replaced this request with a statement that AMES would pay for the accommodation.

22.     On or around August 23, 2011, MATTIODA then made a reasonable accommodation request with Irene Salazar, Disability Program Manager at Ames' Office of Diversity and Equal Opportunity ("ODEO"), for an upgrade to business travel class for additional leg room due to his disability. MATTIODA attached a medical letter confirming his reasonable accommodation request was based on a medical need for the reasonable accommodation.

23.     On September 7, 2011, Mark Fonda, Deputy Division Chief, Space Science and Astrobiology Division, asked Benjamin Varnell if enough funding was available to provide MATTIODA with the reasonable accommodation travel upgrade.  Mr. Varnell told Mr. Fonda that "There is plenty of money in the panel pot." Ultimately, the NASA Headquarters' official in charge of the CDAP proposal panel review provided the funds for the reasonable accommodation. With the reasonable accommodation provided, MATTIODA attended the CDAP proposed panel review.

24.     On September 8, 2011, Yvonne Ibarra, Division Administrator, asked Mr. Fonda for a "solution" to MATTIODA's future travel requests for reasonable accommodation upgrades. Mr. Fonda told her that, "Well, he will just have to pay the extra expense [for reasonable accommodation]."

25.    On or around September 16, 2011, Dr. Dotson requested MATTIODA come to her office for a "chat." Dr. Dotson told MATTIODA not to attend his next Conference without first telling her. Dr. Dotson said that if MATTIODA made constant reasonable accommodations requests for his job, MATTIODA could "lose your job" because of the requests.  Dr. Dotson told MATTIODA his requests will cause an "undue hardship" on the government, but she would approve the accommodation requests if he used his own grant money to pay for the upgrade travel requests.

26.    After MATTIODA left Dr. Dotson's office, he e-mailed Ms. Salazar and asked, "In the future could you please not speak with my supervisor without talking to me first. This actually makes my situation worse." These harassing treatments of MATTIODA due to his disability were continuous and pervasive thereafter.

27.    On or around September 19, 2011, MATTIODA emailed Ms. Salazar regarding a reason-able accommodation upgrade for travel. MATTIODA said NASA Headquarters was open to allowing him to present via video conferencing if AMES declined the reasonable accommodation.  Again, the constant message from AMES officials was to resist any financing of accommodations.

28.    Around September 2011, MATTIODA requested an ergonomic chair for his office. Dr. Dotson and other AMES officials delayed their response for several months. On or around January 12, 2012, MATTIODA followed up with Dr. Dotson regarding his ergonomic chair.  She then required MATTIODA to spend his own research funds to help partially pay for the ergonomic chair.  On January 12, 2012, Dr. Dotson sent him an e-mail saying, "I have not been able to find any magic pots of $ that have been set aside for reasonable accommodation requests of this nature."

29.    On October 29, 2011, MATTIODA spoke at a Society for the Advancement of Chicanos-Hispanics and Native Americans in Science ("SACNAS") conference. At the conference, MATTIODA asked Dr. Allamandola why he was insistent on getting a picture of MATTIODA giving a presentation. In an exasperated tone, Dr. Allamandola admitted Dr. Lee did not think MATTIODA had any involve-ment with the O/OREOS mission (cubesat mission), and Dr. Lee believed Dr. Erntfreund and Dr. Ricco were the ones involved. Dr. Allamandola said he wanted the picture to highlight MATTIODA's work and convince Dr. Lee that MATTIODA was working on the project.

30.    On October 31, 2011 a (O/OREOS) meeting occurred with Richard Quinn, Dr. Dotson,

1   Dr. Bregman, Dr. Lee, and MATTIODA attending.  In that meeting Dr. Lee mentioned MATTIODA

2   stepping down as Deputy Branch Chief.  In front of everyone, Dr. Lee said MATTIODA should ask

3   NASA Headquarters for any labor funding for himself since, "You chose to step down" from the Deputy

4   Branch Chief position.  His harassing comments about MATTIODA were obviously derogatory. Dr. Lee

5   then followed by blaming MATTIODA for not including a line item for Bob Walker's funding (a Lab

6   Engineering Technician).  MATTIODA pointed out Dr. Lee had already approved and signed off on the

7   budget, and Dr. Lee had not mentioned any issues regarding any line items before approving the budget.

8   Dr. Bregman came to MATTIODA's defense in that group, and said that funding the engineering tech

9   was also "something I could never figure out how to do" when he was the Branch Chief. When everyone

10  had left the meeting Dr. Quinn told MATTIODA that Dr. Lee seemed to be aggravated at MATTIODA

11  for some reason during that meeting. Dr. Lee's openly critical and derogatory comments continued as a

12  form of harassment throughout the months and years thereafter.

13          31.     On or around November 10, 2011, MATTIODA received a mid-term performance

14  review, during which MATTIODA described for Dr. Dotson what he felt was on-going hostile work

15  treatment from Dr. Lee.  AMES, thereafter, took no action about this complaint.  MATTIODA also

16  asked Dr. Dotson to review his ergonomic chair request from September.

17          32.     On December 14, 2011 MATTIODA learned his NASA Postdoctoral Program ("NPP")

18  candidate was rejected from the list of November 2011 selections.  This NPP candidate, Dr. Aurelien

19  Trivella was an extremely outstanding candidate. Dr. Lee headed the NPP selection committee, and the

20  committee ranked Dr. Trivella as eighth.  Dr. Lee then authorized NPP slots to the top seven ranked

21  candidates.  Dr. Dotson later told informed MATTIODA that Dr. Trivella's non-selected was based on

22  the fact that he was a foreign national.  Dr. Dotson's statement could not have been true, because foreign

23  nationals had been previously selected for the NPP program.  Dr. Dotson and Dr. Lee were both aware

24  AMES had changed its prior rule against foreign candidates, yet they used this past rule to reject

25  MATTIODA's candidate.  NPP candidates support work on a scientist's research, increase the published

26  work from each project, and increase the quantity of hours a scientist may work on a particular project or

27  proposal.  This support increase the number of publications and the scientist's h-index score.

28          33.     On December 14, 2011, MATTIODA asked Dr. Dotson why Dr. Lee was given a new

---

NPP candidate every two years since becoming Division Chief.  Her reply was, "That isn't unusual for a successful researcher."  MATTIODA added, "I've only had one NPP in 10 yearsa"  MATTIODA then recalled Dr. Lee and Dr. Dotson had previously said his number of publications needed increasing.  Later that day, Dr. Allamandola sent an e-mail confirming that if MATTIODA had an NPP candidate, that fact would definitely will contribute to an increase in his scientific productivity. This ongoing failure, and future failures, to assign NPP support to MATTIODA was part of the continuous and pervasive harassment he suffered at AMES.

34.    In February 2012, one NPP candidate (selected from December) declined his offer to come to AMES. Instead of offering that newly opened position to the next, and 8th, ranked NPP candidate (Dr. Trivella), AMES selected a lower ranked, foreign national for the now open NPP slot.

35.    In December 2012, while MATTIODA was on sick-leave and required crutches to walk from his second surgery of the year, MATTIODA attended the Division Holiday party. MATTIODA's name had been put in for the GS-15 promotion that year again.  Dr. Lee approached MATTIODA and told him not to get his "hopes up" for the GS-15 promotion because MATTIODA probably would not make the promotion on his first try. Despite Dr. Lee's derogatory comment, MATTIODA was awarded the GS-15 promotion that year.

36.    Around May 2013, MATTIODA met with Dr. Dotson for MATTIODA's Employee Performance Communication System ("EPCS") yearly review. MATTIODA previously had surgery related to his disabilities with complications impacting his ability to travel during the period covered by the performance review. MATTIODA told Dr. Dotson that he was concerned his travel inability related to his disability and surgery might affect his career. Dr. Dotson instructed MATTIODA not to worry about his lack of travel.  But she also stated that because MATTIODA was unable to travel to confer-ences and presentations, she would have to lower MATTIODA's EPCS ratings. She also added, "But nobody pays attention to them [EPCS ratings]." Dr. Dotson's statement was incorrect, and in fact MATTIODA's yearly bonuses have depended on his EPCS ratings.

37.    Between September 2013 and February 2014, MATTIODA proposed to put an experiment on the exposure platform of the International Space Station ("ISS"). This proposal was outside NASA's regular proposal process and was reviewed by George Nelson, Head of Technology

Development at ISS.  Mr. Nelson required a review by Sharon Conover, so MATTIODA asked Dr. Lee to set up a meeting with Dr. Carol Carroll (Assistant Director of Science) who also managed Ames ISS activities. Dr. Carroll eventually told MATTIODA "line management" (including Dr. Lee) needed to advocate for the proposal to go forward.  MATTIODA sent emails to Dr. Dotson, Dr. Lee and Mr. Fonda informing them of the need for line management support.  Instead of supporting the project, Dr. Dotson and Dr. Lee told MATTIODA to submit yet another new proposal requiring peer review.  Ultimately, the proposal died when Dr. Lee and Dr. Dotson chose not to support MATTIODA's proposal.  AMES did not treat other scientists without disabilities in this fashion regarding their proposals.

38.     On or around September 2013, MATTIODA, Dr. Scott Sandford, and Dr. Allamandola met to discuss potential proposal concepts. These discussions continued through October 2013, and MATTIODA proposed a concept for the NASA NAI Cooperative Agreement Notice (CAN) - 7 project. MATTIODA met with Astronomers and arranged other meetings to discuss collaborations on his proposal. In November 2013 Dr. Sandford told MATTIODA that Dr. Lee insisted that either he (Dr. Lee) or Dr. Sandford be identified as the Principal Investigator ("PI") on the NAI CAN 7 (cycle 7) proposal, instead of MATTIODA himself.  MATTIODA discussed this PI issue with Dr. Allamandola who said, "Scott [Dr. Sandford] and Tim [Dr. Lee] seem to have orchestrated a coup d'état."  Because the project would have failed without either of the others being identified as the PI for the project, MATTIODA was pressured into using their names.  The proposal was finally funded using Dr. Sandford as the PI.

39.     On January 23, 2014, Dr. Allamandola sent an e-mail to Dr. Lee, Dr. Dotson, MATTI-ODA, and Dr. Christiaan Boersma stating "Andy has been trying to get a few peanuts to work in this area (chemistry on mineral surfaces) for at least five years. Apparently, the Europeans are heading into this big time. It's time we start managing up and getting HQ to wake up and send a few ^%$#$^@#@# pennies Andy's way."  This e-mail confirmed a five year period in which MATTIODA's superiors had continuously been avoiding support for his scientific projects.  No supporting responses came from either Dr. Lee or Dr. Dotson to Dr. Allamandola's request.

40.     During summer 2014, MATTIODA requested a reasonable accommodation by using Southwest Airlines (instead of NASA's contract carrier) for his airplane flight to a STEM Camp in Oklahoma. Dr. Dotson resisted paying the additional funds for that accommodation. On or around July

9, 2014, Payam Miri wrote an E-mail to Dr. Dotson in which she stated, "Currently Andrew Mattioda's travel for 07/11/14 is awaiting fund certification, however after multiple attempts requesting approval, we have not seen the approval take place. May we get a supervisor approval ... so we may get his flight ticketed?"  On July, 19, 2014, after those multiple requests, Dr. Dotson finally relented and approved the reasonable accommodation for MATTIODA's Southwest airlines ticket. MATTIODA's requests for accommodation were consistently delayed or resisted in this fashion by these AMES' officials.

41.     In September 2014, MATTIODA noticed Dr. Amanda Cook received a brand-new electric sit/stand desk.  Dr. Cook told MATTIODA, "Jessie [Dr. Dotson] bought it for me."  Dr. Cook said she did not have to submit any paperwork or documentation to Dr. Dotson to obtain the desk.  Dr. Cook said that when she went to Dr. Dotson, asked for the desk, "Then it showed up." MATTIODA went to Dr. Dotson's office and also requested an electric standing/sitting desk for himself.  Dr. Dotson told him that he was required to use the written reasonable accommodation request process to get a desk. MATTIODA ultimately did receive a desk, but only after going through a written request process not demanded of others.

42.     On October 30, 2014, Dr. Dotson showed her performance review to MATTIODA and presented a sheet of paper with columns.  Dr. Dotson did not explain to MATTIODA how she came up with the columns or rankings in the paper.  Dr. Dotson told MATTIODA that her list showed the proposal success rates of the Civil Servants in the branch, and she pointed to the lowest value on the list saying, "Do you know who this is right here?"  When MATTIODA said he did not, she responded with, "It's you."  She made the statement to embarrass and humiliate MATTIODA.

43.     In January 2015, Dr. Dotson declined to provide MATTIODA critical support for his SIMPLEX proposal. The SIMPLEX mission proposal was complex and required coordination among a number of NASA Ames units and personnel, along with budgeting from multiple sources.  The proposal deadline was March 13, 2015.  AMES' business office normally helps with putting proposals of this magnitude together because of their complexity and size.  Dr. Dotson had earlier said she would "take care" of any problems that came up.  After the business office indicated they could not provide support until after February 28, 2015, Dr. Dotson's response, instead of offering help to MATTIODA, was, "Oh well, they are very busy with other proposals."  She then walked away and never helped on the project.

44. On March 19, 2015, MATTIODA saw an ear, nose, and throat ("ENT") doctor who discovered an ear infection and instructed MATTIODA not to fly to the 2015 ACS meeting in Denver set for March 22-26. Previously, MATTIODA had informed Dr. Dotson about his repeated ear infections. MATTIODA then called Dr. Allamandola about the situation because Dr. Allamandola was one of the conference organizers. During their discussion Dr. Allamandola admitted he had had to argue with Dr. Lee to convince him to include MATTIODA at the conference. Dr. Allamandola confirmed Dr. Lee had suggested in other meetings that Dr. Lee (a) did not respect MATTIODA's work, (b) thought MATTIODA was lazy, and (c) believed MATTIODA was using his medical and disability issues to avoid work. When MATTIODA later proposed doing a video presentation for the conference, Dr. Lee lied and said the ACS organization did not permit video conferencing.

45. On or around May 5, 2015, Dr. Dotson conducted MATTIODA's EPCS performance review, during which she critically asked, "I need to know if you are still committed to being a high-profile scientist at NASA!" MATTIODA was embarrassed and humiliated by the question. He asked Dr. Dotson to explain her comment, and she first mentioned MATTIODA's non-attendance at the 2015 ACS meeting. She added that MATTIODA had failed to present at that ACS meeting (which had been caused by Dr. Lee's misrepresentation regarding a video presentation). MATTIODA reminded Dr. Dotson that MATTIODA's doctor had ordered him not to fly at all due to a medical condition. This instance was one of several, in which Dr. Dotson linked MATTIODA's job performance rating to his medical conditions and disabilities, and followed MATTIODA's previously telling Dr. Dotson that his travel was limited because of his bone ossification issues.

46. During that same May meeting, Dr. Dotson lowered MATTIODA's rating because he "failed" to submit the SIMPLEX proposal. MATTIODA was shocked at the lower rating because she had previously said that not submitting the SIMPLEX proposal was the "right thing to do." When MATTIODA asked if he should have submitted a proposed doomed to failure, just to be able to say he submitted a proposal, Dr. Dotson said she never suggested that. When MATTIODA asked, "Then what are you suggesting?" she did not respond at all.

47. For the EPCS performance rating, Dr. Dotson ignored MATTIODA's proposals on several instrument developments and his scientific invitations to become a speaker. Those items should

have increased MATTIODA's EPCS rating, but Dr. Dotson did use those items to increase the rating. Dr. Dotson eventually relented, and admitted the SIMPLEX proposal should have been "neutral" or had no impact on MATTIODA's rating. MATTIODA then requested a Reconsideration to his rating.

48.     On July 28, 2015, Dr. Dotson told MATTIODA she had rejected MATTIODA's recon- sideration request regarding his performance rating.  Dr. Dotson then required MATTIODA sign and date her rejection letter.  Her demand was harassing because the agency's regulations required Dr. Dot- son, not MATTIODA, to sign that form.  He had never before been required to sign such a rejection letter.  Even the e-mail from Braxton Toy, HR Specialist, mandated only Dr. Dotson's signature, not MATTIODA's.  This demand to sign was both demeaning and offensive, and was part of the continuous and pervasive harassment pattern MATTIODA had been experiencing for some time.  At this point, MATTIODA became convinced NASA intended to do nothing to remedy the harassment he had been experiencing continuously for several years.

49.     On July 30, 2015, due to the continued harassment and discrimination MATTIODA e- mailed Dr. Bicay requesting a job transfer, with the possibility of transferring from the SSA branch and SS Division but maintaining his current lab instrumentation and work space.  Dr. Bicay responded that such a transfer was feasible but awkward, "Let's talk about it; I believe I am aware of the issues – at some level." MATTIODA was surprised by Dr. Bicay's comment, thinking, "How are you [Dr. Bicay] aware of the issues, and why haven't you done anything to resolve the situation?"

50.     On August 4, 2015 MATTIODA met with Dr. Bicay to discuss the transfer and change in divisions.  MATTIODA told Dr. Bicay about the discrimination, harassment, and retaliation events from 2011 to the present. Dr. Bicay asked, "Do you feel like you are being harassed and discriminated against?"  Since every issue he had experienced had been based on his health issues/disabilities, MATTI- ODA said, "Yes," and then asked Dr. Bicay what he meant with his e-mail message, "I believe I am aware of the issues…"  Dr. Bicay then admitted he had heard rumors about MATTIODA's problems with Dr. Dotson and Dr. Lee.  Dr. Bicay suggested MATTIODA meet with Dr. Arnold, an ombudsman, for an evaluation of the situation. To MATTIODA's knowledge, other than this suggestion, Dr. Bicay did nothing to respond to MATTIODA's report of illegal discrimination and harassment.

51.     On August 7, 2015. MATTIODA met with Dr. Arnold.  MATTIODA detailed the back-

ground and facts regarding his disability, multiple failed reasonable accommodations, and what he considered to be the pervasive atmosphere of illegal harassment he had been undergoing.   MATTIODA was surprised when Dr. Arnold responded with, "I have nothing but the highest respect for her [Dr. Dotson]."  The manner of Dr. Arnold's comment suggested he already believed Dr. Dotson was not guilty of any type of harassment, discrimination, or retaliation. Dr. Arnold then suggested MATTIODA, Dr. Lee and Dr. Dotson meet together about the issues.  MATTIODA said he would normally agree to such a meeting only if one or two events had occurred and his superiors were completely unaware of what they were doing.  Despite the facts, though, MATTIODA agreed to a meeting.

52.     On August 21, 2015. MATTIODA conducted a follow-up meeting with Dr. Bicay and mentioned possibly going to the union or EEO, Dr. Bicay said MATTIODA would achieve better results "going the EEO route."  MATTIODA then made his informal EEO contact with Ms. Salazar, informing her that he wanted to file an informal complaint of discrimination, reprisal, and harassment based on actions that had been continuous and either severe or pervasive over many years.

53.     On August 24, 2015.  MATTIODA met with Dr. Janice Fried (AMES Anti-harassment coordinator) and provided the information for his harassment and retaliation complaint. Dr. Fried admitted that it was "very difficult" to prove harassment using NASA's policies and procedures.

54.     On September 15, 2015, Farzana Moreno (travel lead at AMES) sent an e-mail stating NASA had revised its requirements for travel upgrades when based on disabilities or special needs.  Her message was published on September 18, 2015.  The new requirements specified each AMES manager was required to use certain text when approving a reasonable accommodation travel request.  That text was:  "An accommodation for traveler [name] has been granted by me, for [type-coach upgrade, business, first] class travel, for [length – x month, or permanent] duration."  This requirement did not require (a) a fund manager's written approval or (b) the employee's not-to-exceed-budget.

55.     During the September 13-17, 2015 period, MATTIODA was an invited speaker at a symposium to honor Lou Allamandola' s contributions to molecular science.  After MATTIODA's presentation, Dr. Annemieke Petrignani and Dr. Alessandra Candian from the Netherlands, approached MATTIODA about possibly collaborating on research involving the overtone and combination bands of PAHs. Neither mentioned ever speaking to Dr. Lee regarding this topic, or any topic.

56.    On October 13, 2015 MATTIODA gave an invitational lecture to the Astrochemistry School held at the SETI Institute in Mountain View.  Because of this lecture, Dr. Xinchuan Huang (Dr. Lee's postdoctoral fellow) contacted MATTIODA to discuss the possibility of collaborating with Dr. Petrignani and Dr. Candian.  MATTIODA responded saying he had already discussed this possibility with the two researchers in September.  MATTIODA then learned Dr. Lee had falsely claimed that he, Dr. Lee, was the one who spoke with the two researchers regarding a collaboration with MATTIODA.

57.    By November 16, 2015, AMES had not resolved the informal complaint of discrimination, harassment, and reprisal that MATTIODA had filed in August 2015.  As a result, MATTIODA filed a timely formal complaint against the agency.  In fact, during the agency's 2016 formal investigation into the matter, AMES continued to engage in discrimination, harassment, and reprisal as the events of 2016 showed.

58.    On January 19, 2016, Dr. Michael Bicay sent MATTIODA an e-mail stating he did not find that NASA's NPR 3717.3 policy or NASA's Anti-Harassment Policy had been violated.  However, Dr. Bicay asked that MATTIODA's first and second line supervisors ensure MATTIODA is provided with flexibility in his work schedule. Dr. Bicay also stated that he would instruct MATTIODA's first and second line supervisors to provide reasonable work accommodations for MATTIODA to remain a productive researcher at AMES.

59.    On January 26, 2016, two colleagues Dr. Lee reported to MATTIODA that Dr. Lee had made unprofessional comments regarding MATTIODA. The two colleagues said, "We know he [Dr. Lee] doesn't like you."  The two colleagues then told MATTIODA that at a dinner after an international conference session, Dr. Lee said, "Andy [MATTIODA] is a Deputy Branch Chief because he can't get any funding on his own."  Later during that dinner, when other scientists suggested involving MATTIODA in a research project, Dr. Lee stated, "Good luck getting him [MATTIODA] to do anything." By these comments, Dr. Lee implied MATTIODA was lazy, amongst other things.  When MATTIODA asked why they had not mentioned the comments before, they said Dr. Lee had made such comments so often, that the comments about MATTIODA just became "background noise" to them.

60.    On February 4, 2016, Dr. Boersma and MATTIODA met with Dr. Lee and his postdoctoral fellow, Dr. Huang.  Based on previous exchanges with Dr. Huang, MATTIODA had

1    initiated the meeting to discuss potentially collaborating on a project. Dr. Boersma and MATTIODA

2    presented their concept to Dr. Huang and Dr. Lee. After the presentation, Dr. Lee made it clear Dr. Lee

3    was not interested in collaborating with MATTIODA and Dr. Boersma on that project. Dr. Lee stated

4    that Dr. Boersma and MATTIODA were free to collaborate with other people.

5         61.    MATTIODA has thus filed a timely informal charge, a timely informal charge, and

6    permitted the agency to engage in more than 180 days of investigation before bringing this matter to

7    court. As a result, MATTIODA has exhausted all administrative remedies needed to timely bring this

8    complaint against Defendant.

9                    **GENERAL ALLEGATIONS FROM SECOND FILED COMPLAINT**

10        62.    MATTIODA realleges and incorporates by reference the allegations of the prior

11   paragraphs.

12        63.    On September 18, 2015. Farzana Mareno ("Ms. Mareno"), NASA travel office represen-

13   tative, sent a center wide  e-mail stating that NASA had revised its requirements for travel upgrades

14   based on disabilities or special needs, entitled, NASA Interim Directive 9700.3: Supplemental Premium

15   Travel Procedural Requirements. The center wide message regarding this topic was issued on September

16   18, 2015. The updated requirements within NASA Interim Directive 9700.3 indicated what text a

17   manager was to use when approving a reasonable accommodation travel. That specific text is: "An

18   accommodation for traveler [name] has been granted by me, for [type-coach upgrade, business, first]

19   class travel, for [length – x month, or permanent] duration." The new requirement does not mention

20   obtaining a fund manager's written approval or requiring a not to exceed budget. NASA Interim

21   Directive 9700.3 stated "This specific notice shall not include information regarding the specific medical

22   condition requiring the upgrade nor should the accommodation exceed the least expensive class

23   alternative or beyond the duration as determined by the physician."

24        64.    AMES' center wide Directive was issued after MATTIODA has filed multiple internal,

25   verbal, and written complaints about NASA's lack of policies to deal with reasonable accommodations

26   related to travel. MATTIODA is informed and believes, this AMES Directive occurred because of his

27   multiple internal, verbal, and written complaints about the lack of policies to protect his rights in

28   requesting travel related reasonable accommodations.

65.    On or around November 4, 2015, MATTIODA emailed Ivan Alvarez, Financial Management Specialist, regarding his reasonable accommodation travel upgrade.  He asked whether he was required to include additional documentation with regard to the new NASA Interim Directive 9700.3 requirements. MATTIODA asked Mr. Alvarez this question after MATTIODA had already completed the reasonable accommodation requests for his travel application that summer.  Mr. Alvarez replied via email stating MATTIODA's medical waiver needed to be upgraded to specify the type of upgrade (i.e. Coach Plus, Business, First Class) requested.  In addition, MATTIODA was required to state the length of time the medical waiver was effective. Mr. Alvarez concluded his email by stating, "Once you [MATTIODA] receive your medical waiver from your doctor, you must bring it to the health unit to give you and your supervisor a recommendation.  Your supervisor will email you CC'ing myself and Irene Najlis (Center Disability Program Manager) to give approval.  Your supervisor must state what s/he is approving for, attached with the Health unit's waiver."  Alvarez did not indicate MATTIODA's supervisor was allowed to impose additional requirements beyond AMES Directive.  MATTIODA considered these "new" requirements even more roadblocks to and harassment fir his reasonable accommodation travel requests, and these "new" requirements were an attempt by NASA to frustrate the ability to access reasonable accommodations for travel.

66.    On or about April 27, 2016, Dr. Osborn sent a letter to AMES Medical unit regarding MATTIODA's reasonable accommodation travel upgrade request. Dr. Osborn concluded his letter by stating, "Over the past 5 years, I [Dr. Osborn] have provided Dr. Mattioda [MATTIODA] with medical letters documenting his orthopedic condition numerous times for the reasonable accommodation requests at his place of employment (AMES).  At the time of each request we have discussed his work environment.  He has expressed concern over his work environment numerous times, noting that several supervisors have been less than supportive of his condition. I am concerned that such an environment will prevent Dr. Mattioda from taking the required breaks to perform stretches, ice the joints, etc. Neglecting these activities will serve to hasten the deterioration of his spine and hips."

67.    On or about April 27, 2016, Dr. Dotson requested MATTIODA to "supply funding information and approval" from principal investigator ("PI"), Dr. Sandford, for a machine shop work project to be completed via the Airborne Instrument Development Laboratory.  Previously, when

MATTIODA's portion of the proposed budget had a positive value funding amount, MATTIODA was free to spend those budgeted funds as needed to complete MATTIODA's portion of the proposal.  This event was the first time Dr. Dotson demanded MATTIODA obtain PI approval before spending funds that were already subject to his discretion. Based on the 16-year history of AMES receiving NAI grant awards, MATTIODA was the only co-principal investigator required to obtain PI approval before using funds previously budgeted to a co-principal investigator.  Dr. Sandford transferred the required respective funds to all the other co-investigator's identified on the NAI CAN 7 grant without receiving approval requests from those co-investigators.

68.     On or about April 29, 2016, in anticipation of upcoming travel, MATTIODA submitted a new medical waiver to NASA. After Dr. Firestone (AMES Medical Director) reviewed MATTIODA's letter, he recommended an upgrade to Business or First Class. MATTIODA sent Dr. Dotson a letter from Dr. Firestone confirming the available a reasonable accommodation travel "other than coach-class."

69.     On or about May 6, 2016, Dr. Dotson told MATTIODA Dr. Dotson had granted the travel accommodation request, but then added the requirement that MATTIODA (1) provide written or email concurrence from the manager of the travel funds, and (2)  provide that concurrence to the SSA branch chief and assistant branch chief.  MATTIODA was thus instructed to provide proof of written or email concurrence and a not-to-exceed budget with regard to his travel.  Dr. Dotson made MATTIODA the first person in NASA history to pay for this reasonable accommodation travel request through his own funded projects.  And Dr. Dotson made MATTIODA the first person required to obtain permission from the PI to utilize travel funds already budgeted to him within a research grant.

70.     NASA, not MATTIODA, is required to pay for employee reasonable accommodation travel requests.  Due to Dr. Dotson's adding these requirements to the travel requests, Dr. Dotson required MATTIODA to either, (1)  pay for MATTIODA's own reasonable accommodation request from his own research funds (NAI CAN 7 funding), while also obtaining PI approval and be put on a not-to-exceed budget, or (2) obtain written permission from Dr. Sandford.  Both options from Dr. Dotson violated NASA policy that the Agency, not the individual, pay for accommodations.  Dr. Dotson's demands were harassing, demeaning, humiliating, and infuriating.

71.     On May 10, 2016, Yvonne Ibarra, administrative assistant for Dr. Pendleton, met

1   MATTIODA for lunch. During that lunch, Ms. Ibarra told MATTIODA of a conversation she had with

2   Dr. Pendleton on or around May 9, 2016, wherein Dr. Lee had met with Dr. Pendleton. After Dr. Lee

3   left, Dr. Pendleton told her that Dr. Lee had said he (Dr. Lee) was "having issues" with MATTIODA.

4         72.   On May 12, 2016, MATTIODA requested a reasonable accommodation travel request for

5   an upcoming work trip to Choctaw and Chickasaw Native American STEM (Science Technology Engi-

6   neering Mathematics) camps.  Prior to MATTIODA's reasonable accommodation travel request, Dr.

7   Dotson sent an e-mail demanding MATTIODA obtain his "fund manager" approval for his NAI CAN 7

8   grant. Dr. Dotson demanded MATTIODA supply written concurrence that funds were available to be

9   spent on the business class ticket.  Dr. Dotson also demanded MATTIODA's "fund manager" include a

10  not-to-exceed budget for MATTIODA. That e-mail confirmed AMES was requiring MATTIODA to use

11  his own research funds to pay for the reasonable accommodation travel. In addition, Dr. Dotson required

12  MATTIODA to disclose the existence of his disabilities to his "fund manager," i.e., someone who did

13  not need to know about MATTIODA's disabilities. MATTIODA considered this demand to be harassing

14  and humiliating. Dr. Dotson's additional requirements insinuated MATTIODA had done "something

15  wrong," and required MATTIODA to disclose the existence of orthopedic disabilities.

16        73.   On May 12, 2016, Dr. Dotson sent the fund manager, Dr. Sandford, an e-mail confirming

17  she expected to see Dr. Sandford's "not-to-exceed budget" for MATTIODA's reasonable accommoda-

18  tion travel.  Dr. Dotson also stated that she and another AMES employee "are happy to manage [MAT-

19  TIODA] to a not-to-exceed budget." This additional requirement and disclosures to persons about his

20  orthopedic needs for reasonable accommodation were harassing, humiliating, and infuriating.

21        74.   On or around May 12, 2016, MATTIODA sent Dr. Michael Bicay ("Dr. Bicay"), Science

22  Directorate Chief - MATTIODA's third level supervisor - an email, "I would like to report continuing

23  harassment by my immediate supervisor, Dr. Jessie Dotson."  MATTIODA then detailed Dr. Dotson's

24  actions regarding her personally imposed requirements on MATTIODA's reasonable accommodation

25  travel requests.  MATTIODA said, "Dr. Dotson has added this additional requirement in retaliation for

26  my previous EEO activities and due to my disabilities."  Dr. Bicay responded to the email saying he

27  would speak to Dr. Dotson about the complaint. MATTIODA sent another e-mail confirming he would

28  file another harassment complaint and another EEO complaint regarding these specially imposed

---

requirements on him as a person with disabilities.  MATTIODA stated he would also report Dr. Dotson

had discussed MATTIODA's medical issues with Dr. Sandford.  MATTIODA told Dr. Bicay, "Jessie is

doing this purely to embarrass me, harass me, retaliate against me and discriminate against me."

75.     On May 12, 2016, MATTIODA sent an email to Dr. Sandford, Dr. Dotson, and Ms. Mar-
tinez. The email message said MATTIODA was not willing to submit to Dr. Dotson's newly created
additional travel requirements because the requirements violated NASA regulations. MATTIODA then
told Dr. Sandford MATTIODA would no longer oversee the Native American camps program.

76.     On May 13, 2016, Dr. Sandford asked that MATTIODA continue to both coordinate,
manage, and attend the Native American camps. MATTIODA replied, saying he was unwilling to
submit to the additional travel restrictions because Dr. Dotson had added unauthorized requirements to
MATTIODA's travel requests, that nothing in NASA's Interim Directive 9700.3 granted Dr. Dotson that
authority.  Because of his inability to travel and oversee the program MATTIODA stated he could not
effectively manage the program at the Native American camps.

77.     On May 13, 2016, Dr. Dotson sent an e-mail effectively admitting she had been the one
who developed the two new requirements for "your [MATTIODA's] reasonable accommodation
request."  MATTIODA felt humiliated by Dr. Dotson's demands, which no other official at AMES was
interested in countermanding.

78.     On May 16, 2016 MATTIODA asked Dr. Bicay in an email to start the discrimination
and harassment EEO complaint process as soon as possible.

79.     On May 18, 2016 Dr. Bicay sent and e-mail, telling MATTIODA Dr. Dotson "claims the
rules for you [MATTIODA] are not more onerous than for anyone else in the branch."  MATTIODA
responded with, "Jessie's [Dr. Dotson's] new requirements add nothing to the procedure other than to
humiliate me [MATTIODA] for having a disability. That statement implies a disabled person is unable
to manage their own accounts. It is the same as saying every African American/woman/LGBT/etc. has to
provide a do-not-exceed budget and get extra approval before traveling."

80.     Later on May 18, 2016 MATTIODA told Dr. Bicay in a second e-mail that, "I am inform-
ing you that what Jessie Dotson has done and is doing to me is discriminatory, humiliating, harassing
and amounts to an unjust reprimand of me, simply because I have a disability and I engaged in prior

protected activity." MATTIODA also stated that regarding the Native American camps, "I will not demean and humiliate myself just to travel. If these requirements were added to me because of race, gender, sexual orientation, etc. the answer would-be clear-cut harassment and discrimination."

81. On May 18, 2016, Dr. Bicay responded saying he did not know enough details to either agree or disagree with MATTIODA. But, Dr. Bicay did not offer to investigate MATTIODA's claims.

82. On May 19, 2016, MATTIODA confirmed to Dr. Bicay in an e-mail that MATTIODA had fulfilled obligations required under the NASA Anti-Harassment policy to inform a manager about harassment in the work place. He also reminded Dr. Bicay about Dr. Bicay's earlier commitment (made in writing) to provide a "healthy work environment, free of harassment and retribution."

83. On May 19, 2016, Dr. Bicay sent an e-mail stating his conclusion that it was "necessary" to transfer" MATTIODA from "code SSA to code SST." Dr. Bicay also said, "I am hoping this timeout will allow Andy some space to reflect on how any and all actions are perceived." He added that AMES management "must be perceived as going the extra mile to accommodate Mattioda." Dr. Bicay then openly admitted, "This transfer needs to be done quickly, given that he [MATTIODA] filed his EEO action some time ago, and we may already be culpable for not acting fast enough."

84. On May 20, 2016, Braxton Toy (AMES Human Resources), in response to Dr. Bicay's transfer request, asked AMES Human Resources to transfer MATTIODA from his job.

85. Sometime in the week after May 19, 2016, Dr. Bicay told MATTIODA in the hallway, "To help calm the waters and to provide you with a 'safe space,' I propose to transfer you from Code SSA to Code SST for ... six months." Dr. Bicay repeated that same message in his e-mail to MATTI-ODA on May 25, 2016. Dr. Bicay never transferred Dr. Jessie Dotson to "create a safe space."

86. Around May 18-25, 2016, MATTIODA spoke with Dr. Max Bernstein. Dr. Bernstein told MATTIODA that Dr. Lee "won't be a big issue" because Dr. Lee will eventually step down as Division Chief. Dr. Bernstein recommended that MATTIODA smooth over the issues with Dr. Dotson because management had big plans for her, she would be moving up, and Dr. Bernstein believed MATTIODA will not fare well if he were on Dr. Dotson's bad side.

87. On May 23, 2016, MATTIODA met with Dr. Deborah Feng ("Dr. Feng"), Associate Center Director, AMES, to initiate his informal harassment and reprisal complaint. MATTIODA later

met with the investigator, Dr. Alfonso Vera, who said he had been conducting investigations for many years and it was "very difficult to prove harassment." "To prove harassment, the manager basically has to say, 'Yes, I was harassing him' in order to get a finding of harassment."

88.     On May 31, 2016, MATTIODA told Dr. Bicay, "Although I would prefer for you to transfer Jessie Dotson instead of myself, since management is at fault here, I will agree to the temporary transfer to SST so that I can continue my work. The management within the Division should be cautioned about what they say about this situation. I already know of two instances where management, within the Division, have said to others at Ames, who are not in my line management, that I am causing trouble. Such statements do not help to resolve the issues or 'calm the waters.'"

89.     On June 7, 2016, Dr. Bicay told MATTIODA Dr. Bicay would caution managers in the SS about "characterizing" any of the employees. MATTIODA believed Dr. Bicay's choice of words regarding "characterizing" were odd. When MATTIODA met with Dr. Sandford that same day about separating MATTIODA's laboratory funding from Dr. Sandford's laboratory funding, Dr. Sandford refused. In that conversation Dr. Sandford said something like, "You need that extra travel for your neck and back issues." It was obvious Dr. Dotson had told Dr. Sandford about MATTIODA's reasonable accommodation travel issues as well as MATTIODA's hip and back disabilities without permission. Later Dr. Sandford added, "I know about it [the EEO complaint] and I don't want to get in the middle of it [the EEO complaint]." MATTIODA was upset and angered again that Dr. Bicay and others had disclosed the existence and substance of his EEO concerns to others without a need to know.

90.     On June 9, 2016, MATTIODA e-mailed Dr. Bicay, telling him that Dr. Sandford had detailed knowledge of MATTIODA's health issues, and that Dr. Sandford knew about MATTIODA's EEO complaint. MATTIODA had never discussed his EEO complaint with Dr. Sandford.

91.     On June 28, 2016, Dr. Reggie Hudson and Dr. Stefanie Milam asked MATTIODA if he would be a chair for an educational session for the Astrochemistry Division at the Fall American Chemical Society ("ACS") meeting in Philadelphia. MATTIODA was already set to present a speech at the same ACS meeting. MATTIODA responded that, while he was honored and normally would accept the opportunity, he had an ear infection that prohibited him from accepting the invitation. MATTIODA had already informed AMES of his need for treatments for an ear infection, and potential disability, called

Methicillin-resistant Staphylococcus aureus ("MRSA") infection.

92.     On or around June 26, 2016, the Agency transferred MATTIODA from SSA (Astro-physics Branch) to SST (Planetary Sciences).

93.     On or around July 25, 2016, MATTIODA underwent a tympanoplasty surgery on his left ear to remove and replace ear tissues.

94.     On or around October 4, 2016, the AMES Deputy Center Director (Dr. Thomas Edwards) issued a decision on MATTIODA's harassment complaint about Dr. Dotson's travel requirements. In the memorandum to MATTIODA, Dr. Edwards wrote that Dr. Dotson's actions "adversely affected your work environment by requiring you to disclose your disability to managers who should not need to know about it." Dr. Edwards also stated, "This complaint sheds light on a shortcoming of the Agency's policies and procedures, however. There is no clear approach to handle the financial repercussions of RA findings, and so managers and employees can be left lacking the tools needed to provide accommo-dations." Dr. Edwards then requested AMES assemble a team to develop recommendations clarifying: (1) the roles, responsibilities, and authorities in making reasonable accommodation travel request deter-minations, (2) which officials should have access to information, and (3) how to secure funds necessary to fulfill reasonable accommodation determinations. Dr. Edwards set a date of no later than March 31, 2017 for the team to brief center management on its progress.

95.     On November 29, 2016, MATTIODA encountered Julie Nottage (the building manager), and she stated she couldn't believe MATTIODA was having troubles with "the folks in SSA." When MATTIODA asked who had said "trouble with folks in SSA," she gave the name of the Assistant to the Branch Chief (Jessie Dotson), who said MATTIODA was transferred because he "had trouble with his management" in SSA.

96.     After filing his timely informal charge, MATTIODA followed with a timely formal charge of discrimination, and permitted the agency to engage in more than 180 days of investigation before bringing this matter to court. As a result, MATTIODA has exhausted all administrative remedies needed to timely bring this complaint against Defendant.

**GENERAL ALLEGATIONS FROM THIRD FILED COMPLAINT**

97.     MATTIODA realleges and incorporates by reference the allegations of the prior

paragraphs.

98.     On or around July 25, 2016, MATTIODA underwent a tympanoplasty surgery on his left ear to remove and replace the Methicillin-resistant Staphylococcus aureus ("MRSA") infected tissue.

99.     On October 4, 2016, Dr. Thomas A. Edwards ("Dr. Edwards"), Deputy Center Director, sent both SSA and MATTIODA a memorandum regarding MATTIODA's internal second discrimination and harassment complaint. Dr. Edwards admitted Dr. Dotson's actions "adversely impacted your work environment by requiring MATTIODA to disclose his disabilities to managers who should not need to know about it." Dr. Edwards also acknowledged MATTIODA's "complaint sheds light on a shortcoming of the Agency's policies and procedures" as there "is no clear approach to handle the financial repercussions of RA findings, and so managers and employees can be left lacking the tools needed to provide accommodations."

100.    On or about October 2016, MATTIODA made a reasonable accommodation travel upgrade request for his flight to the International Space Sciences Institute, located in Bern, Switzerland. MATTIODA was granted the upgrade and made this trip working under Dr. Jeff Hollingsworth, Planetary Systems Branch Chief.

101.    On November 29, 2016, MATTIODA encountered Julie Nottage, AMES Facility Safety Coordinator, in the AMES second floor copy room. Ms. Nottage used words like, "I couldn't believe you had trouble with the folks in SSA but it's good you had somewhere else to go." Ms. Nottage's comment upset MATTIODA, and he was surprised someone had told Ms. Nottage that he had 'trouble' with management in SSA. Later, MATTIODA asked Ms. Nottage who had told her about "trouble" with management in SSA, and Ms. Nottage said she was told by Christine Martinez, Assistant Branch Chief to Dr. Jessie Dotson. This event occurred five months after Dr. Bicay had written his e-mail directing SS Division managers not to discuss MATTIODA's EEO and harassment issues with others.

102.    On February 9, 2017, MATTIODA met with Dr. Tim Lee, Dr. Farid Salama, Dr. Steve Howell, and Mark Fonda in the Code SS Division Office (Dr. Lee's office at the time). During this meeting Dr. Lee asked the group's opinion regarding who would support Dr. Christian Boersma's work on the Lab Astro WP (Work Project). MATTIODA suggested he would oversee and support Boersma's work, and the suggestion upset Dr. Lee, so that Dr. Lee replied, almost shouting at Mattioda, "Well you

do realize you are going to have to manage him!" Dr. Lee's shouting question implied MATTIODA was incapable or too lazy to manage Dr. Boersma. But for MATTIODA's disability and EEO actions, Dr. Lee would not have yelled at MATTIODA. The purpose and effect of Dr. Lee's outburst was to embarrass and humiliate MATTIODA in front of Dr. Howell, Dr. Salama and Mr. Fonda.

103.    On February 15, 2017, MATTIODA learned Dr. Lee had met with Dr. Boersma regarding work on the Lab Astro WP without including, informing, or even inviting MATTIODA.  Dr. Lee discussed changing Dr. Boersma's work on the project without including MATTIODA in the decision making process for the changes. Dr. Lee's failure to include MATTIODA caused significant issues for MATTIODA's ability to prepare his own component to the Lab Astro WP.  Dr. Lee purposefully excluded MATTIODA from those discussions to harass, humiliate, and embarrass MATTIODA and in retaliation for MATTIODA's prior EEO complaints.

104.    On that same date, MATTIODA submitted his component of the Lab Astro WP to Dr. Lee who told MATTIODA that MATTIODA had failed to include any travel funds in that component of the Lab Astro WP.  When MATTIODA asked if he was required to include estimates for reasonable accommodation travel requests within his travel funds proposal, Dr. Lee responded with, "Yes, the travel funds for RA [reasonable accommodation] need to be included until such time that AMES implements a Centerwide fund to cover that (which they have not done and I don't know if they will). Please send new totals with these questions answered." Dr. Lee's response confirmed AMES still resisted providing travel accommodations, and that any person with a disability, such as MATTIODA, needed to pay for his own travel accommodations.

105.    MATTIODA asked Dr. Salama whether Dr. Lee had requested Dr. Salama submit a report that itemized travel requests by person, indicating costs for each person.  Dr. Salama said Dr. Lee had not required that individual traveler breakdown. MATTIODA then sent to Dr. Lee a travel funds request with the same type of breakdown Dr. Salama had submitted. Dr. Lee then rejected MATTIODA's proposal for travel, even though the request was the same.  Dr. Lee treated MATTIODA differently because of his disability, constituted harassment based on disability, and was a form of reprisal.

106.    Around March 20, 2017, MATTIODA discussed his new proposal concept for the Astrophysics Data Analysis program (ADAP) with Dr. Doug Hudgins, Discipline Scientist, to ensure MATTI-

ODA's proposal concept aligned with program requirements. Dr. Hudgins said the proposal concept was aligned with the program requirements, so MATTIODA submitted his new proposal.  On or around May 2016, Dr. Hudgins sent an e-mail telling MATTIODA that his  proposal was not responsive (aligned) to the program requirements, and Dr. Hudgins had rejected the proposal without submitting it for review. Without copying MATTIODA, Dr. Hudgins sent a separate e-mail to Dr. Dotson and Dr. Lee with the text included, "FYI."  Dr. Hudgins was informing these AMES officials that he was acting consistently with what he knew were their efforts to curtail MATTIODA's professional development.

107.    On December 11, 2017, MATTIODA e-mailed Dr. Hudgins an update on a project. Dr. Hudgins responded that he could not recommend, and did not recommend, the Astrophysics division fund any of MATTIODA's projects. Dr. Hudgins copied his e-mail to NASA's Astrophysics program, and the head of NASA's Planetary Science Program, as well as other leaders of  NASA's Planetary Science program.  This denial of participation in the project was another effort to harass MATTIODA because of his disability, and to support the actions of Dr. Dotson and Dr. Lee against MATTIODA.

108.    On December 13, 2017, MATTIODA was notified that his Emerging Worlds proposal had been rejected for funding by the Planetary Science division. After the rejection, MATTIODA's, co-investigator on the proposal, Dr. Uma Gorti, asked him, "Is anyone at NASA Headquarters mad at you?" Dr. Gorti explained that her extensive experience with NASA proposal review panels, taught her that the decision not to fund MATTIODA's proposal was "purely political" and not based on merit. Dr. Gorti also said other Emerging Worlds proposals with identical scores as MATTIODA's were funded in the same call.  AMES' action to reject this project was yet another form of reprisal.

109.    On December 20, 2017, MATTIODA e-mailed Dr. Jeff Grossman, Discipline Scientist for Emerging Worlds program, regarding MATTIODA's rejection and the unfair rating his Emerging Worlds proposal had received. Eventually, Dr. Grossman agreed to provide preliminary funding for two of the three years requested. MATTIODA believes Dr. Grossman's partial response was an additional attempt to support the retaliatory efforts by Dr. Lee and Dr. Dotson against MATTIODA.

110.    In response to all these forms of additional harassment and reprisal for his ongoing EEO complaints, MATTIODA met with AMES' officials to register an informal charge of discrimination, harassment, and/or reprisal.

111.    After filing his timely informal charge, MATTIODA followed with a timely formal charge of discrimination, and permitted the agency to engage in more than 180 days of investigation before bringing this matter to court.  As a result, MATTIODA has exhausted all administrative remedies needed to timely bring this complaint against Defendant.

## GENERAL ALLEGATIONS FROM FOURTH FILED COMPLAINT

112.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

113.    Sometime around Spring 2017, Dr. Tim Lee ("Dr. Lee") stepped down from the SS Division Branch Chief position. MATTIODA had filed prior EEO Complaints against NASA and named Dr. Lee in his complaints.  NASA was well aware of MATTIODA's disability status before 2017. Despite MATTIODA's prior EEO and harassment complaints against Dr. Lee, when Dr. Lee stepped down from his Branch Chief position, NASA assigned Dr. Lee to work in the Planetary Sciences Branch, alongside MATTIODA. Dr. Lee then used about $3,000 of Division funds to redecorate his new office, next to MATTIODA, despite having previously told MATTIODA the Agency lacked funds to pay for MATTIODA's reasonable accommodation requests.

114.    On April 10, 2017, Dr. Lee downgraded MATTIODA's role in the Ames PAHdb section. Dr. Lee then directed Dr. Christiaan Boersma ("Dr. Boersma") (who was supposed to be working with and for MATTIODA) to begin reporting to three others instead of solely to MATTIODA.

115.    On April 11, 2017, MATTIODA sent Dr. Lee an e-mail detailing the discrimination and harassment he had endured from Dr. Lee since February 2017.  Dr. Lee responded saying that he did not agree with the stated facts, and, "I [Dr. Lee] have better things to do than rehash history."

116.    On April 11, 2017, MATTIODA exchanged emails with Dr. Steve Howell ("Dr. Howell"), requesting a meeting.  Dr. Howell responded, "If you are having an issue with Tim [Dr. Lee] and the WP [Lab Astro WP] formulation, I'd suggest you take [sic] to him. Next step is to talk to your branch chief." MATTIODA then provided Dr. Howell a high level overview of the  years of discrimination and retaliation involving Dr. Lee.  MATTIODA said Dr. Lee's stripping authority for the Lab Astro WP formulation was a continuation of the harassment.  When MATTIODA cited examples about Dr. Lee's shunning and excluding MATTIODA from certain critical meetings, Dr. Howell admitted,

---

"Yeah, that was kinda weird."  MATTIODA also commented he had heard Dr. Lee made several derogatory comments about MATTIODA that included the false comments that MATTIODA was a "troublemaker," and had been transferred to SST because he could not get along with SSA management. Dr. Howell did not offer to pass this information onward so that NASA could start a discrimination or harassment investigation.

117.    On May 10, 2017, Mr. Mark Fonda ("Dr. Fonda") asked Dr. Lee's opinion about involving MATTIODA in a Lab Astro Tour.  Dr. Lee responded, "Not Andy."  Other than a retaliatory motive, Dr. Lee had no other reason to deny this tour opportunity to MATTIODA.

118.    On June 5, 2017, Defendant announced a job opening for Senior Scientist, Laboratory Astrophysics Position, with a closing date of June 30, 2017. Before the announcement, AMES Director Dr. Eugene Tu ("Dr. Tu") had stated in a November 19, 2016 email that, "I think we need to take a look at the diversity of our ST [Senior Technical] positions."  NASA's policy based diversity on ethnic minority status and disability status.  Knowing NASA expressed an interested in a "diversity" based candidate for future Sr. Technical positions, MATTIODA was extremely interested in the position, and was the only known scientist with any diversity characteristic, i.e., a disability background.

119.    On June 15, 2017, MATTIODA reported to Dr. Michael Bicay ("Dr. Bicay"), the false and derogatory comments Dr. Lee had made about MATTIODA being a "trouble maker" and having issues with others in the department.  MATTIODA also told Dr. Bicay he was still being harassed by Dr. Lee.  MATTIODA also confirmed speaking with Dr. Howell about these issues on April 11, 2017. Dr. Bicay said he would speak with Dr. Howell about these concerns and "get back" to MATTIODA.

120.    On June 23, 2017, Dr. Bicay forwarded an e-mail to MATTIODA confirming only one person had applied for the Sr. Technical Scientist position, but that person was "outside the area of consideration."  The e-mail also asked if the Agency wanted to "extend the vacancy, if needed," so additional applicants could submit their names.

121.    On June 30, 2017, MATTIODA submitted his application for the Senior Scientist, Laboratory Astrophysics position (ST position). MATTIODA listed his disabilities on his profile page to ensure that Defendant knew he was a "diversity" candidate.  MATTIODA confirmed he wanted consideration under Schedule A hiring, i.e., preferential hiring for certain classes of applicants.

122.     On July 10, 2017,  Dr. Lee told Dr. Steve Zornetzer about MATTIODA's EEO and harassment complaints.  As of June 2017, NASA had assigned Dr. Lee to be on the selection panel ("ST Panel") to select the person filling the Sr. Technical Scientist position. NASA allowed Dr. Lee onto this panel, which had accepted MATTIODA's application, despite the fact that Dr. Lee was the person against whom MATTIODA had filed prior EEO complaints.

123.     In that July 10, 2017 meeting, Dr. Lee spoke with the other hiring panel members about MATTIODA. For whatever reason, and in violation of both procedures and custom, all the members of the ST Panel either destroyed, or removed, their notes taken from that meeting, thus creating a spoliation of the evidence.  About one month after making these comments about MATTIODA and other potential candidates to the hiring panel, Dr. Lee recused himself from serving on the ST Panel.  Dr. Jaya Bajpayee ("Dr. Bajpayee") replaced him.  MATTIODA believes based on the other circumstances surrounding the selection process, that Dr. Lee communicated with others during this one month period of activity.

124.     The Sr. Technical Position announcement stated the qualified candidate would (1) conduct individual research in laboratory astrophysics, astrochemistry, and astrobiology; (2) provide intellectual leadership to scientists conducting new laboratory astrophysics, astrochemistry, and astrobiology experiments; (3) assist the Division Chief in developing new programs; and (4) assist the Division Chief to enhance the technical quality and stature of the Division's programs.  The announcement said nothing about desired "deep space" mission experience, only "mission experience."  The announcement said nothing about "h-index" as a qualifying factor.

125.     MATTIODA realized he was one of, if not the most, qualified candidate for the Sr. Technical Position.  He had the most experience covering cubesats, International Space Station, and small-sats, all of which were part of the "space mission" experience desired for the position. No other scientist in the Agency had qualifications that exceeded his.  If the ST position focused on realignment with NASA HQ, MATTIODA was also the most qualified to fill the ST position for that future function.

126.     Between June 30 and July 18, 2017, Dr. Max Bernstein sent an e-mail to the ST panel or specific panel members indicating the overall rating in his evaluation spreadsheet was "not" the average of the scores. Dr. Bernstein "adjusted" the ratings in the evaluation spreadsheet to emphasize certain evaluation criteria that benefitted Dr. Scott Sandford (Dr. Sandford") specifically, Evaluation Criteria 2

for the ST position. In doing so, Dr. Bernstein de-emphasized the criteria that benefitted MATTIODA. Dr. Bernstein had been aware of MATTIODA's prior EEO complaints related to disability discrimination and disability harassment.

127.   The ST Panel specifically elected not to interview MATTIODA for the Sr. Technical Scientist position.  The ST Panel provided no reason for not interviewing MATTIODA, when in the past, such interviews were customary procedure for final qualified candidates.

128.   Two of the three panel members knew of MATTIODA's EEO activities and prior complaints, as did the panel chair.  Significant differences occurred in ratings given to MATTIODA by the various panel members. This significant disparity corresponded to each person's knowledge of, and opinion of, MATTIODA's prior EEO activity.  One member, Dr. Bajpayee, who had no knowledge of MATTIODA's EEO activity, rated MATTIODA 200 to 400% higher than either Mr. Fonda, or Dr. Bernstein, both of whom were aware of the prior discrimination and harassment complaints.  The ratings were obviously subjective instead of objective, and designed to avoid the original criteria set for the position selection.

129.   On July 25, 2017, the ST Panel announced that "only Dr. Scott Sandford" was "highly selectable" for this position.  Based on the scores of the non-biased panel members, MATTIODA was also rated as "highly qualified." Additionally, MATTIODA had Schedule 1 disability status for the interview process, and was within a preferential hiring category, whereas Dr. Sandford was not.

130.   On August 8, 2017, Dr. Zornetzer told MATTIODA that he was one of three candidates reviewed for the ST position, but the ST Panel had not selected MATTIODA.  Dr. Zornetzer said the two main reasons for MATTIODA not being selected were:  (1) MATTIODA's lower h-index score, and (2) MATTIODA's lack of "deep space" mission experience.  Again, both the h-index score and deep space mission experience were never listed as requisite qualifications in the job position announcement. The ST position was a Laboratory Astrophysics position, not a mission position. Deep space mission experience would have been irrelevant to this ST position.  Dr. Zornetzer's proffered explanation on behalf of the ST Panel was unworthy of credence because it was grossly inconsistent with the objective criteria already established before the panel met.

131.   Dr. Zornetzer also said he relied on the three senior-level astrophysicists on the panel for

their interpretation of each candidate's "h-index" data.  In several prior private conversations before he

recused himself, Dr. Lee had mentioned his opinions about the importance of an "h-index" for scientists.

The h-index roughly measures the number of publications produced by a particular scientist over the

years, and that number is directly affected by (1) the number of years of publishing, (2) the number of

post-doctoral researchers assigned to a scientist, and (3) the number of projects approved by NASA for

its scientists. In comparison to Dr. Sandford, MATTIODA had fewer years as a researcher at NASA, had

fewer active months as a researcher (because of his disabilities), had fewer publications via post-doctoral

candidates (because NASA discriminatorily restricted his number of post-doctoral candidates), and had

fewer approved research projects. As a result of NASA's past discrimination against MATTIODA, its

decision to use factors never listed in the job announcement, and its decision to define the two critical

factors as being those non-job-related factors for which Dr. Sandford had the greater of, NASA manipu-

lated the ST Position hiring process against MATTIODA.

132.    Within 45 days, MATTIODA contacted an EEO counselor and made his informal com-

plaint about the ST Position non-selection.  MATTIODA alleged the denial of the ST Position was in

retaliation for his earlier EEO activities, and that NASA was continuously retaliating against him.  After

this timely informal charge, MATTIODA followed with a timely formal charge of discrimination, and

permitted the agency to engage in more than 180 days of investigation before bringing this matter to

court.  As a result, MATTIODA has exhausted all administrative remedies needed to timely bring this

complaint against Defendant, including MATTIODA's complaint that the retaliation was on-going and

included the ST Position.

133.    On December 13, 2017, Dr. Bicay told MATTIODA that Dr. Bicay wanted the ST posi-

tion (Dr. Sandford) to assist in negotiating new hires for the group and obtaining direct funding from

NASA Headquarters.  MATTIODA and Dr. Farid Salama had vast experience with these two functions.

In contrast, for some 10 years, Dr. Sandford had not had a relationship with, nor had he even worked

with, the Astrophysics Program at NASA Headquarters.  This admission was yet other evidence that

NASA's rationale for not selecting MATTIODA for the ST position was unworthy of credence because

it was internally inconsistent.

134.    On April 18, 2018, an announcement was posted for a vacant position in the Astrophysics

and Astrochemistry Laboratory group. MATTIODA volunteered to serve on the selection/rating panel. On April 30, 2018, during a meeting with Dr. Jeff Hollingsworth, MATTIODA told Dr. Hollingsworth that he felt like Dr. Howell had blacklisted MATTIODA due to his disabilities and prior protected activities. MATTIODA also told Dr. Hollingsworth that he had volunteered to be on the selection committee for the new Laboratory Astrophysics position, but had not been selected for that committee.

135. On or about June 29, 2018, MATTIODA learned NASA had hired a new Astrophysics and Astrochemistry Laboratory hire. MATTIODA was not consulted regarding the new hire, even though he was the only potential "unbiased" Astrophysics evaluator when the other two evaluators both had their own research candidates applying for the job. Again, NASA retaliated against MATTIODA by excluding him from an assignment wherein he was the only obvious, nonbiased selecting official.

136. During 2018 MATTIODA worked months on the team's 2018 version of the Lab Astro WP. MATTIODA was a senior member of that package. On July 3, 2018, Dr. Howell announced Dr. Ella Sciamma O'Brien ("Dr. Sciamma O'Brien")would be the point of contact for the work package. NASA's selection was in direct contradiction to Dr. Bicay's prior statement that MATTIODA was to participate in the "leadership and vision" for the future of the Astrophysics program. The selection was yet another form of ongoing retaliation.

137. On August 1, 2018, Dr. Howell led a SS Division panel meeting to review potential NPP postdoctoral candidates. For MATTIODA's proposed NPP candidate, Dr. Howell asked him aggressive and interrogation-like questions regarding that candidate. Dr. Howell did not ask these same aggressive and interrogation-like questions of the other scientists with proposed candidates. But for MATTIODA's disability and prior EEO complaints, Dr. Howell would not have treated MATTIODA in this manner.

138. On August 17, 2018, MATTIODA was informed his NPP postdoctoral applicant was not selected in this round of applications. The reasons listed for not selecting MATTIODA's candidate mirrored Dr. Howell's comments given during his aggressive questioning of MATTIODA. Dr. Howell controlled whether MATTIODA's NPP candidate was selected, and this non-selection was yet another form of reprisal / retaliation.

139. On October 26, 2018, when MATTIODA was moving an item in the lab, Dr. Salama yelled out to him, "Watch it. Don't hurt your back, I know you have back issues." MATTIODA had

1  never told Dr. Salama about his back disability issues, so Defendant must have disclosed confidential

2  information about his hips, back, and accommodations without MATTIODA's permission.

3      140.    On March 19, 2019, Ms. Kim Dufour, representative for USJobs website, told MATTI-

4  ODA that when the ST Position was being evaluated in late 2017, NASA had never requested disability

5  status information from that USJOBS system.  Despite the 2017 vacancy announcement having stated

6  the position was open to candidates with disabilities, NASA never requested the disability status for any

7  candidates.  NASA apparently never intended to promote anyone with a disability, or in accord with

8  Schedule-A preference, or in accord with the prior recommendations for "diversity."

9                                   **COUNT ONE**

10                            **FIRST FILED COMPLAINT**

11                          **Disability Discrimination, Harassment**

12                  **THE REHABILITATION ACT OF 1973:  SECTION 501**

13      141.    MATTIODA realleges and incorporates by reference the allegations of the prior

14  paragraphs.

15      142.    The adverse actions, omissions and conduct against MATTIODA as alleged above,

16  including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner

17  as non-disabled employees, continuously and pervasively harassing MATTIODA over many years

18  (including with respect to evaluations and promotions), and directing adverse treatment against him

19  because of his disability conditions, constitute discrimination and harassment because of disability in

20  violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

21      143.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees

22  and agents were committed within the scope of their employment, agency or other similar relationship

23  and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and

24  conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disabilities

25  was continuous and pervasive.

26      144.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA

27  has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional

28  pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of

---

Plaintiff's First Amended Complaint                                                              33

enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT TWO

### FIRST FILED COMPLAINT

**Failure To Engage in the Interactive Process**

**THE REHABILITATION ACT OF 1973:  SECTION 501**

145.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

146.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years (including denying requested reasonable accommodations), and providing adverse treatment instead of providing reasonable accommodation were all because of his disability conditions, all constitute discrimination and continuous failures to accommodate his disabilities in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

147.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

148.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT THREE

### FIRST FILED COMPLAINT

**Reprisal**

**THE REHABILITATION ACT OF 1973:  SECTION 501**

149.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

150.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years, and directing adverse treatment against him were effected in part because of MATTIODA's objections to illegal discrimination and harassment, including his demands for reasonable accommodation and funding, and  and therefore violate Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

151.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

152.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

### COUNT FOUR

### SECOND FILED COMPLAINT

### Disability Discrimination and Harassment

### THE REHABILITATION ACT OF 1973:  SECTION 501

153.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

154.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner

as non-disabled employees, continuously and pervasively harassing MATTIODA over many years (including with respect to subjecting MATTIODA to additional requirements, and disclosing personal and private information), and directing adverse treatment against him because of his disability conditions, constitute discrimination and harassment because of disability in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

155.   The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disabilities was continuous and pervasive.

156.   As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT FIVE

## SECOND FILED COMPLAINT

### Failure To Engage in the Interactive Process

### THE REHABILITATION ACT OF 1973:  SECTION 501

157.   MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

158.   The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years (including denying requested reasonable accommodations), and providing adverse treatment instead of providing reasonable accommodation were all because of his disability conditions, all constitute discrimination and continuous failures to accommodate his disabilities in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

159.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

160.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

**COUNT SIX**

**SECOND FILED COMPLAINT**

**Reprisal**

**THE REHABILITATION ACT OF 1973:  SECTION 501**

161.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

162.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years, and directing adverse treatment against him were effected in part because of MATTIODA's objections to illegal discrimination and harassment, including his demands for reasonable accommodation and funding, and  and therefore violate Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.  The reprisal included Defendant's discussions about MATTIODA's complaints, his medical disabilities, and making negative statements about his work at AMES.

163.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or

1   perceived disability was continuous and pervasive.

2   164.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA
3   has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional
4   pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of
5   enjoyment of life in an amount to be proven at trial.

6   WHEREFORE, MATTIODA prays for judgment as set forth below.

7                                       **COUNT SEVEN**

8                                 **THIRD FILED COMPLAINT**

9                          **Disability Discrimination and Harassment**

10                **THE REHABILITATION ACT OF 1973:  SECTION 501**

11   165.    MATTIODA realleges and incorporates by reference the allegations of the prior
12   paragraphs.

13   166.    The adverse actions, omissions and conduct against MATTIODA as alleged above,
14   including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner
15   as non-disabled employees, continuously and pervasively harassing MATTIODA over many years
16   (including with respect to subjecting MATTIODA to additional requirements, and disclosing personal
17   and private information), and directing adverse treatment against him because of his disability condi-
18   tions, constitute discrimination and harassment because of disability in violation of Section 501 of the
19   Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

20   167.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees
21   and agents were committed within the scope of their employment, agency or other similar relationship
22   and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and
23   conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disabilities
24   were continuous and pervasive.

25   168.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA
26   has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional
27   pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of
28   enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT EIGHT

## THIRD FILED COMPLAINT

### Failure To Provide Reasonable Accommodation

### THE REHABILITATION ACT OF 1973:  SECTION 501

169.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

170.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA (including denying requested reasonable accommodations), and providing adverse treatment instead of providing reasonable accommodation were all because of his disability conditions, constitute discrimination and continuous failures to accommodate his disabilities in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

171.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

172.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT NINE

## THIRD FILED COMPLAINT

### Reprisal

### THE REHABILITATION ACT OF 1973:  SECTION 501

173.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

174.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years, and directing and supporting adverse treatment against him were effected in part because of MATTIODA's objections to illegal discrimination and harassment, including his demands for reasonable accommodation and funding, and his filing of discrimination claims, and therefore violate Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.  The reprisal included Defendant's discussions about MATTIODA's complaints, his medical disabilities, making negative statements about his work at AMES, and attempts to support MATTIODA's harassers.

175.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability or perceived disability was continuous and pervasive.

176.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

**COUNT TEN**

**FOURTH FILED COMPLAINT**

**Disability Discrimination and Harassment**

**THE REHABILITATION ACT OF 1973:  SECTION 501**

177.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

178.    The adverse actions, omissions and ongoing conduct against MATTIODA as alleged

above, including but not limited to intentional acts described herein, failing to interview plaintiff for the ST position, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years (including with respect to subjecting MATTIODA to additional requirements, and disclosing personal and private information), and directing adverse treatment against him because of his disability conditions, constitute discrimination and harassment because of disability in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.

179.    The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents were committed within the scope of their employment, agency or other similar relationship and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disabilities was continuous and pervasive.

180.    As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of life in an amount to be proven at trial.

WHEREFORE, MATTIODA prays for judgment as set forth below.

## COUNT ELEVEN

## FOURTH FILED COMPLAINT

### Reprisal

## THE REHABILITATION ACT OF 1973:  SECTION 501

181.    MATTIODA realleges and incorporates by reference the allegations of the prior paragraphs.

182.    The adverse actions, omissions and conduct against MATTIODA as alleged above, including but not limited to intentional acts described herein, failing to treat plaintiff in the same manner as non-disabled employees, continuously and pervasively harassing MATTIODA over many years, and directing adverse treatment against him were effected in part because of MATTIODA's objections to illegal discrimination and harassment, including his demands for reasonable accommodation and

1  funding, and filing of EEO complaints, and therefore violate Section 501 of the Rehabilitation Act of
2  1973, 29 U.S.C. § 791 et seq.  The reprisal included Defendant's discussions about MATTIODA's
3  complaints, his medical disabilities, and making negative statements about his work at NASA.

4       183.   The adverse actions, omissions and conduct alleged herein by the Defendant's employees
5  and agents were committed within the scope of their employment, agency or other similar relationship
6  and were all ratified by the governmental agency Defendant.  The adverse actions, omissions and
7  conduct alleged herein by the Defendant's employees and agents based on MATTIODA's disability,
8  internal complaints, and EEO complaints were continuous and pervasive.

9       184.   As a result of the wrongful actions, omissions and conduct by Defendant, MATTIODA
10 has suffered a deprivation of equal employment opportunities; damages including wage loss, emotional
11 pain, loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of
12 enjoyment of life in an amount to be proven at trial.

13      WHEREFORE, MATTIODA prays for judgment as set forth below.

14 **PRAYER**

15 **FIRST FILED COMPLAINT**

16      ANDREW MATTIODA prays for judgment as follows:

17      1.   Compensatory damages according to proof, including wage loss, benefits, emotional pain,
18 loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of
19 life in an amount to be proven at trial in an amount of $300,000, exclusive of lost wages;

20      2.   Reasonable attorneys fees pursuant to Section 505(b) of the Rehabilitation Act of 1973,
21 29 U.S.C. §794a(b) attorneys fees and costs of suit;

22      4.   Pre- and Post- Judgment Interest;

23      5.   Such other and further relief as this court may deem just and proper.

24 **PRAYER**

25 **SECOND FILED COMPLAINT**

26      ANDREW MATTIODA prays for judgment as follows:

27      1.   Compensatory damages according to proof, including wage loss, benefits, emotional pain,
28 loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of

1   life in an amount to be proven at trial in a separate amount of $300,000, exclusive of lost wages;

2       2.      Reasonable attorneys fees pursuant to Section 505(b) of the Rehabilitation Act of 1973,

3   29 U.S.C. §794a(b) attorneys fees and costs of suit;

4       4.      Pre- and Post- Judgment Interest;

5       5.      Such other and further relief as this court may deem just and proper.

6                                       **PRAYER**

7                           **THIRD FILED COMPLAINT**

8       ANDREW MATTIODA prays for judgment as follows:

9       1.      Compensatory damages according to proof, including wage loss, benefits, emotional pain,

10  loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of

11  life in an amount to be proven at trial in a separate amount of $300,000, exclusive of lost wages;

12      2.      Reasonable attorneys fees pursuant to Section 505(b) of the Rehabilitation Act of 1973,

13  29 U.S.C. §794a(b) attorneys fees and costs of suit;

14      4.      Pre- and Post- Judgment Interest;

15      5.      Such other and further relief as this court may deem just and proper.

16                                      **PRAYER**

17                          **FOURTH FILED COMPLAINT**

18      ANDREW MATTIODA prays for judgment as follows:

19      1.      Compensatory damages according to proof, including wage loss, benefits, emotional pain,

20  loss of self-esteem, grief, stress, anxiety, stigma, humiliation, mental anguish, and loss of enjoyment of

21  life in an amount to be proven at trial in a separate amount of $300,000, exclusive of lost wages;

22      2.      Reasonable attorneys fees pursuant to Section 505(b) of the Rehabilitation Act of 1973,

23  29 U.S.C. §794a(b) attorneys fees and costs of suit;

24      4.      Pre- and Post- Judgment Interest;

25      5.      Such other and further relief as this court may deem just and proper.

26

27

28

**DEMAND FOR JURY TRIAL**

MATTIODA demands a trial by jury on all claims alleged herein and via amended pleadings, if any.

DATED: September 14, 2020

/s/
_____
ADAM S. JURATOVAC, Esq.
EMPLOYMENT RIGHTS ATTORNEYS
Attorneys for Plaintiff, ANDREW MATTIODA