1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    ANDREW MATTIODA,                          Case No.  20-cv-03662-SVK

8                    Plaintiff,

9           v.                                 **ORDER ON NASA'S MOTION FOR
                                               SUMMARY JUDGMENT OR
10   JIM BRIDENSTINE, et al.,                   SUMMARY ADJUDICATION**

11                  Defendants.                Re: Dkt. No. 36

12         Plaintiff Andrew Mattioda, who has been employed as a scientist for Defendant National

13   Aeronautics and Space Administration ("NASA") at its Ames Research Center ("ARC") since

14   2007, claims that he was subjected to disability-based discrimination during his employment.

15   Dkt. 26 ("Second Amended Complaint" or "SAC").  All parties have consented to the jurisdiction

16   of a magistrate judge.  Dkt. 9, 12; *see also* Case No. 20-cv-3745 at Dkt. 14; Dkt. 20-cv-3849 at

17   Dkt. 12; 20-cv-4457 at Dkt. 17.

18         Now before the Court is NASA's motion for summary judgment or summary adjudication,

19   which Mattioda opposes.  Dkt. 36 (Motion); 43 (Opp.); 44 (Reply).  The Court held a hearing by

20   Zoom on January 25, 2002.  After considering the parties' submissions, arguments at the hearing,

21   the case file, and relevant law, and for the reasons discussed below, NASA's motion for summary

22   judgment is **GRANTED IN PART and DENIED IN PART.**

23   I.    BACKGROUND

24         A.     Factual Background

25         Since August 2007, Mattioda has been employed as a Space and Planetary Scientist with

26   the Planetary Science Branch ("SST") at the NASA ARC.  SAC ¶ 6.  Mattioda states that he has

27   been diagnosed with disorders of his hips and spine and that he has experienced life-long ear

28   infections.  *Id.* ¶ 7.

United States District Court
Northern District of California

1   Defendant William Nelson II, the NASA agency head, is the proper defendant in this

2   Rehabilitation Act case against NASA.  *See SAI v. Smith*, No. 16-cv-01024-JST, 2018 WL

3   534305, at *8 (N.D. Cal. Jan. 24, 2018).

4       **B.    Procedural History**

5       Before filing this lawsuit, Mattioda filed four Equal Employment Opportunity ("EEO")

6   complaints with NASA.  Exs. A, C, D, and E to Dkt. 17-2.  Thereafter, Mattioda filed four

7   complaints in this District, on June 2, 2020; June 5, 2020; June 23, 2020; and July 6, 2020.  *See*

8   *generally* Dkt. 10.  On September 3, 2020, the Court consolidated the cases.  Dkt. 15.

9       As directed by the Court, Mattioda filed a consolidated complaint on September 14, 2020.

10  *See* Dkt. 16 ("FAC").  In the FAC, Mattioda alleged that beginning in March 2011, he experienced

11  harassment, discrimination, failure to engage in the iterative process/provide a reasonable

12  accommodation, and reprisal.  *See id.* ¶¶ 10-140.  NASA moved to dismiss the FAC.  Dkt. 27.  On

13  January 8, 2021, the Court denied NASA's motion to dismiss the FAC under Federal Rule of Civil

14  Procedure 12(b)(1) for lack of subject matter jurisdiction and granted in part and denied in part

15  NASA's motion to dismiss the FAC under Rule 12(b)(6).  Dkt. 24 (the "January 8 Order").

16  Among other things, the Court held that due to the limitations period within which a federal

17  employee must contact an EEO counselor, any discrimination claims based on discrete adverse

18  actions occurring before July 7, 2015 (*i.e.,* discrimination claims occurring more than 45 days

19  before Mattioda first contacted an EEO counselor on August 21, 2015) were dismissed without

20  leave to amend.  *Id.* at 24.  The Court explained that "Plaintiff may not present evidence of those

21  events as a continuing violation based on a theory of discrimination, although in some

22  circumstances evidence of past conduct that was not timely presented to the EEO may be

23  presented 'as background evidence in support of a timely claim.'"  *Id.* (citing *Nat'l R.R. Passenger*

24  *Corp. v. Morgan,* 536 U.S. 101, 113 (2002) and *Williams v. Wolf*, No. 19-cv-00652-JCS, 2019 WL

25  6311381, at *10 (N.D. Cal. Nov. 25. 2019)).  The Court stated that "[t]o the extent such evidence

26  may be permissible, objections to that evidence arising under the Federal Rules of Evidence, as

27  well as rulings on those objections, are reserved for discovery and trial."  January 8 Order at 24-

28  25.  The Court granted Mattioda leave to amend the FAC to address certain other deficiencies

United States District Court
Northern District of California

1  identified in the January 8 Order.  *Id.* at 22-32.

2      Mattioda then filed the Second Amended Complaint.  Dkt. 26 ("SAC").  The SAC contains

3  claims for harassment, discrimination, failure to engage in the iterative process/provide a

4  reasonable accommodation, and reprisal.  *Id.*  NASA moved to dismiss the SAC.  Dkt. 27. On

5  April 26, 2021, the Court issued an order denying NASA's motion to dismiss Mattioda's claim for

6  disability-based discrimination and granting without leave to amend NASA's motion to dismiss

7  Mattioda's claim for disability-based harassment, failure to accommodate, failure to engage in the

8  interactive process, and retaliation.  Dkt. 31 (the "April 26 Order").

9  **II.      LEGAL STANDARD**

10      **A.      Summary Judgment**

11      Summary judgment is appropriate if the moving party shows that there is no genuine

12  dispute as to any material fact and the party is entitled to judgment as a matter of law.  Fed. R.

13  Civ. P. 56(a).  A fact is material if it may affect the outcome of the case.  *Anderson v. Liberty*

14  *Lobby, Inc.*, 477 U.S. 242, 248 (1985).  A genuine dispute of material fact exists if there is

15  sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

16      The party moving for summary judgment bears the initial burden of informing the court of

17  the basis for the motion and identifying portions of the pleadings, depositions, answers to

18  interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

19  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

20      Where the party moving for summary judgment has the burden of persuasion at trial, such

21  as where the moving party seeks summary judgment on its own claims or defenses, the moving

22  party must establish "beyond controversy every essential element of its [claim]."  *So. Cal. Gas Co.*

23  *v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted).  Where the moving

24  party seeks summary judgment on a claim or defense on which the opposing party bears the

25  burden of persuasion at trial, "the moving party must either produce evidence negating an essential

26  element of the nonmoving party's claim or defense or show that the nonmoving party does not

27  have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

28  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the

United States District Court
Northern District of California

1    moving party meets its initial burden, the burden shifts to the nonmoving party to produce

2    evidence supporting its claims or defenses.  *Id.* at 1103.  If the nonmoving party does not produce

3    evidence to show a genuine issue of material fact, the moving party is entitled to summary

4    judgment.  *Celotex*, 477 U.S. at 323.

5         "The court must view the evidence in the light most favorable to the nonmovant and draw

6    all reasonable inferences in the nonmovant's favor."  *City of Pomona v. SQM N. Am. Corp.*, 750

7    F.3d 1036, 1049 (9th Cir. 2014).  However, the party opposing summary judgment must direct the

8    court's attention to "specific, triable facts."  *So. Cal. Gas*, 336 F.3d at 889.  "[T]he mere existence

9    of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for

10   summary judgment.  *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not

11   lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

12   *City of Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

13   *Corp.*, 475 U.S. 574, 587 (1986)).

14        **B.        Disability Discrimination Claim**

15        As discussed above, the only remaining cause of action in this case is Mattioda's claim for

16   disability-based discrimination under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*  Motions for

17   summary judgment on federal employment discrimination claims are analyzed under the three-

18   step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

19   802 (1973).  *See, e.g.*, *Chuang v. University of California Davis*, 225 F.3d 1115, 1123–24 (9th Cir.

20   2000); *see also Green v. City and County of San Francisco*, No. 17-cv-00607-TSH, 2021 WL

21   3810243, at *24-25 (N.D. Cal. Aug. 25, 2021).[1]  First, the plaintiff must establish a prima facie

22   case of discrimination by showing that: (1) he is a person with a disability; (2) he is otherwise

23   qualified to do his job; (3) he suffered discrimination because of his disability.  *Walton v. U.S.*

24   *Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007).  The proof necessary for a plaintiff to

25   _____

26   [1] Mattioda states that the *McDonnell-Douglas* burden-shifting framework does not apply in
     discrimination cases where the plaintiff presents direct evidence of the employer's intentional
27   discrimination (Opp. at 15), but he does not expressly argue that the framework does not apply in
     this case, and he argues his position in terms of the framework of prima facie case (*id.* at 14) and
28   pretext (*id.* at 24-25).  Accordingly, the Court utilizes the *McDonnell-Douglas* framework in
     deciding the motion for summary judgment.

1  establish a prima facie case is "minimal" and need not even rise to the level of a preponderance of

2  the evidence.  *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).  The plaintiff need

3  only offer evidence that "gives rise to an inference of unlawful discrimination," arising either

4  under the *McDonnell Douglas* presumption or by more direct evidence of discriminatory intent.

5  *Id*.  If the plaintiff proves his prima facie case, the burden of production then shifts to the employer

6  to articulate a legitimate, nondiscriminatory reason for the alleged action.  *See Lucero v. Hart*, 915

7  F.2d 1367, 1371 (9th Cir. 1990).  If the employer does so, the burden shifts back to the plaintiff to

8  show that the articulated reason is pretextual.  *Lober v. Dejoy*, 845 Fed. Appx. 672, 673 (9th Cir.

9  2021) (citing *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) and *Coons v. Sec'y*

10  *of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004)).  "A plaintiff 'may demonstrate

11  pretext either directly by persuading the court that a discriminatory reasons likely motivated [the

12  defendant] or indirectly by showing that [the defendant's] proffered explanation is unworthy of

13  credence.'"  *Gaytan v. Solis,* No. C 07-6367 SBA, 2012 WL 2367822, at *4 (N.D. Cal. June 21,

14  2012) (quoting *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1212 (9th Cir. 2008)).  The

15  ultimate burden of persuading the trier of fact that the employer intentionally discriminated

16  remains at all times with the plaintiff.  *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S.

17  133, 143 (2000).

18  **III.    DISCUSSION**

19           As a result of the January 8 and April 26 Orders, (1) the only claim still in the case is

20  Mattioda's claim for disability-based discrimination; and (2) that claim cannot be based on

21  discrete adverse actions occurring before July 7, 2015, or on a theory that events in that time

22  period are part of a continuing violation, although in some circumstances evidence of conduct in

23  that time period may be relevant as background evidence in support of a timely claim.  *See*

24  January 8 Order; April 26 Order.  In its motion for summary judgment, NASA argues that

25  Mattioda cannot raise a triable issue of fact as to a prima facie showing of disability

26  discrimination, and that even if he can, the undisputed and unrebutted facts show that NASA had

27  legitimate, non-discriminatory reasons for its actions.  Motion at 9-25.

28           According to NASA, as a result of the Court's previous orders, only five discrete events

United States District Court
Northern District of California

1 remain at issue in the case:  (1) Mattioda's 2015 performance review; (2) his 2016 job transfer;

2 (3) a dispute over the use of grant funds in 2016; (4) his non-selection for a senior scientist

3 position in 2017; and (5) the non-selection of Mattioda's candidate for a postdoctoral position in

4 2018.  *Id.* at 8-9.  Mattioda, on the other hand, contends that in the summary judgment motion,

5 "NASA has failed to address more than 12 timely facts, circumstances, or discriminatory [e]vents"

6 from the SAC.  Opp. at 1.  This order addresses the events in the relevant time period[2] using the

7 Mattioda's numbering, grouping events where they relate to similar subject matter.

8        **A.      Mattioda's 2015 Performance Review (Plaintiff's Event 1)**

9        Mattioda identifies his 2015 performance review as an incident of disability

10 discrimination.  Opp. at 4-5.  As an initial matter, NASA notes that this event "bookends the

11 July 7, 2015 timely filing cutoff."  Motion at 3.  The performance review covers the period from

12 May 1, 2014 to April 30, 2015 and appears to have been prepared in May or June 2015.  Ex. D to

13 Dkt. 36-2.[3]  However, as discussed below, the 2015 performance review was reconsidered and the

14 reconsideration decision issued on July 23, 2015, which was after the July 7, 2015 "cutoff."  Ex. F.

15 Accordingly, the Court will consider Mattioda's argument that the 2015 performance review was

16 an act of disability discrimination.

17        The 2015 performance review involved evaluation of two performance elements, each of

18 which could be rated as either "Level 5 – Substantially Exceeds Expectations," "Level 3 – Meets

19 Expectations," or "Level 1 – Fails to Meet Expectations."  Ex. D at PDF pp. 61, 65.  Mattioda's

20 first-level supervisor at the time, Dr. Jessie Dotson, gave Mattioda the highest score of "Level 5 -

21

22 [2] As discussed above, the Court previously dismissed any discrimination claims based on discrete
adverse actions occurring before July 7, 2015.  January 8 Order at 24.  Although Mattioda
23 discusses some events that pre-date July 7, 2015, in his opposition to the motion for summary
judgment (*see, e.g.,* Opp. at 2-4), the Court has not considered them except those events connected
24 to his 2015 performance review which, as NASA notes, "bookends the July 7, 2015 timely filing
cutoff."  Motion at 3.

25 [3] Exs. A-RR refer to exhibits to the Declaration of James A. Scharf filed with NASA's motion for
26 summary judgment (Dkt. 36-2).  Exs. SS-NN refer to exhibits to the Second Declaration of
James A. Scharf filed with NASA's reply in support of the motion for summary judgment (Dkt.
27 44-2).  Exs. 1-27 refer to exhibits to the Declaration of Andrew Mattioda filed with Plaintiff's
opposition to the motion for summary judgment (Dkt. 43-2).  Exs. 28-45 refer to exhibits to the
28 Declaration of Richard Schramm filed with Plaintiff's opposition to the motion for summary
judgment (Dkt. 43-4).

United States District Court
Northern District of California

1   Substantially Exceeds Expectations" for his laboratory work and gave him the second-highest

2   score of "Level Three - Meets Expectations" for his performance as an instrument developer.  *Id*.

3   It appears that based on Dotson's ratings, Mattioda was given an overall rating of "Level 4 –

4   Accomplished."  *Id.* at PDF p. 60.

5       In late June 2015, Mattioda raised issues he thought Dotson had overlooked in rating him

6   as "meets expectations" for the second element.  Ex. E.  Although the administrative deadline for

7   formal reconsideration requests had already passed, Dotson advocated with the human resources

8   department to waive the deadline and allow Mattioda to pursue the reconsideration process.  *Id*.

9   On July 23, 2015, Dotson issued her reconsideration decision.  Ex. F.  After reviewing additional

10  information provided by Mattioda, Dotson determined that she had correctly rated Mattioda as

11  "meets expectations" for the instrument developer metric.  *Id*.  The reconsideration decision

12  explained that the information provided by Mattioda did not fulfill the standard for "exceeds

13  expectations" because "[o]ne's status in a team … does not satisfy this performance standard" and

14  "providing suggestions is considered to be a standard component of being a team member and

15  does not rise to the higher level of contribution (as indicated by being proactive and initiating

16  improvements) required for the higher rating."  *Id.*

17              **1.        Prima facie case**

18      NASA argues that Mattioda has failed to make a prima facie case that his 2015

19  performance review constitutes disability-based discrimination because the review did not have

20  any negative impact on Mattioda.  Motion at 9.  NASA argues that Mattioda has failed to present

21  evidence that the review, in which he received the highest possible rating on one element and the

22  second-highest rating on the other, affected his bonus or other terms or conditions of his

23  employment.  *Id*.

24      For purposes of a disability discrimination claim, an adverse employment action is one that

25  "materially affect[s] the compensation, terms, conditions, or privileges of … employment."  *Davis*

26  *v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (modifications original), quoting *Chuang*,

27  225 F.3d at 1126.  Not every employment decision amounts to an adverse employment

28  action.  "An adverse employment action must be significant, and trivial harms such as petty slights

United States District Court
Northern District of California

1    or minor annoyances are not actionable." *Green*, 2021 WL 3810243, at *32 (citing *Burlington*

2    *Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)); *see also Burlington Indus., Inc. v.*

3    *Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change

4    in employment status, such as hiring, firing, failing to promote, reassignment with significantly

5    different responsibilities, or a decision causing a significant change in benefits."); *Aki v. Univ. of*

6    *Cal. Lawrence Berkeley Natl. Lab.*, 74 F. Supp. 3d 1163, 1175 (N.D. Cal. 2014) ("Examples of

7    adverse employment actions include termination of employment, demotion evidenced by a

8    decrease in wage or salary, a less distinguished title, a material loss of benefits or diminished

9    material responsibilities" (citation omitted)).  By contrast, an adverse employment action does not

10   occur where, for example, an employee is merely snubbed or ostracized but this treatment did not

11   affect the employee's ability to perform his job.  *Aki*, 74 F. Supp. 3d at 1181; *see also Brooks v.*

12   *City of San Mateo*, 229 F.3d 917, 928-29 (9th Cir. 2000).

13       Mattioda argues that his "bonuses depended on his evaluations and he received no 2015

14   bonus."  Opp. at 4 (citing Mattioda Decl. (Dkt. 43-1) ¶ 28).  In the cited paragraph from his

15   declaration, Mattioda states that "my yearly bonuses and my eligibility for promotions depend

16   almost entirely on my performance evaluation scores."  Mattioda Decl. ¶ 28.  This paragraph of

17   Mattioda's declaration states that NASA policy "explicitly states that my bonuses and eligibility

18   for promotions depend on these evaluations and the narrative summary which supports those

19   evaluations" and attaches as an exhibit NASA Procedural Requirement 3451B, entitled "NASA

20   Awards and Recognition Program." *Id.*; Ex. 4.  The attached NASA policy states, with respect to

21   awards based on performance:

22       2.2.3.1. The amount of the award must be linked to an employee's performance and
23       be based on the summary performance rating level.

24       2.2.3.2.  An employee may be rewarded with cash, time off, or a combination of
         cash and time off.  An employee with a higher performance rating level (e.g.,
25       Distinguished) must receive a greater monetary performance award (including
         combined monetary and time off), based on a percentage of salary, than an
26       employee with a lower performance summary rating level (e.g., Accomplished).

27       2.2.3.3.  The narrative summary that documents the overall performance of the
28       employee shall serve as justification for a performance award.

8

United States District Court
Northern District of California

Ex. 4 at PDF p. 11.[4]

Although Mattioda has presented evidence of NASA's policy indicating that employee performance ratings *could* affect the employee's performance-based awards, he has presented no evidence that his 2015 performance review *did* affect his bonus.  He has presented no evidence to support the argument in his opposition brief that he did not receive a bonus in 2015, nor has he presented any evidence that his non-receipt of a bonus was linked to the challenged 2015 performance review.  In fact, at his deposition Mattioda was asked about the effect of the performance review on his bonus:

> Q:  Did anyone ever tell you that that specific performance review affected your bonus, lowered your bonus?
>
> A:  Did anybody personally tell me?  No.

Ex. 1 at PDF p. 27 (140:14-17); *see also* Ex. B at PDF p. 54 (Mattioda Response to Interrogatory No. 5) ("The adverse action on my 2015 ECPS rating is difficult for me to compute.  Only NASA knows what I lost on a monthly or annual basis, from the lowered performance review").

Accordingly, Mattioda has not presented evidence that the 2015 performance review affected his bonus.

The Court also considers, however, whether the performance review *itself* constituted an adverse employment action.  The Ninth Circuit has held that "an undeserved negative performance review can constitute an adverse employment decision."  *Brooks*, 229 F.3d at 929 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)); *see also Robinson v. County of San Joaquin*, 693 Fed. Appx. 653, 654 (9th Cir. 2017).  Applying that principle here, the Court concludes that the 2015 performance review satisfies the requirement of an adverse employment action.

In deciding whether Mattioda has made a prima facie showing of disability discrimination based on the performance review, the Court must also consider whether Mattioda has shown that

---

[4] The NASA policy submitted by Mattioda states that it became effective on June 4, 2009, but is now obsolete and no longer used.  Dkt. 43-2 at PDF pp. 10, 16.  NASA does not dispute that the policy submitted by Mattioda was in effect at the times relevant to the challenged 2014-15 performance review.

1    the performance review was linked to his disability. According to Mattioda, Dotson identified two

2    reasons for giving Mattioda the "meets expectations" rating: (1) Mattioda terminated his

3    SIMPLEx proposal; and (2) Mattioda did not attend the Denver meeting of the American

4    Chemical Society ("ACS"), at which he was supposed to give a presentation. Opp. at 4-5; *see also*

5    Mattioda Decl. ¶ 34.

6          Mattioda has failed to establish any link between the first basis for the challenged

7    performance review—his termination of his SIMPLEx proposal—and his disability. To the

8    contrary, in a February 2015 email chain, Mattioda acknowledged issues with the proposal and

9    communicated his decision to terminate it. Ex. DDD. Mattioda complains that Dotson lowered

10   his performance rating despite previously approving his termination of the SIMPLEx proposal.

11   Opp. at 4. However, Mattioda has not demonstrated any link between these events and his

12   disability.

13         With respect to the other basis for Mattioda's "meets expectations" rating—his non-

14   attendance at the ACS meeting in Denver—Mattioda claims that he told Dotson before his 2015

15   performance review that he was unable to attend the meeting because of his disability. Mattioda

16   Decl. ¶¶ 32-33. Specifically, Mattioda states that in March 2015, his ear, nose, and throat doctor

17   discovered a severe ear infection and advised him not to fly to the meeting and that he had told his

18   managers that he could not attend the conference. *Id.* NASA does not address this specific point

19   in the reply papers. *See* Reply at 3-5. Instead, in both its motion and reply papers, NASA relies

20   largely on the "same-actor inference" for the proposition that because Dotson, even knowing of

21   Mattioda's disabilities, gave Mattioda the highest performance ratings every year before 2015

22   (when she rated him one rating lower in one element) and facilitated reconsideration of his 2015

23   review, her motives should be presumed to be non-discriminatory. Motion at 11; Reply at 5. At

24   the hearing, Mattioda argued that the same-actor inference has been repudiated. The Court need

25   not resolve this disagreement because even if NASA is right that a same-actor inference applies, it

26   would only create a strong, but rebuttable, inference of non-discriminatory motive. *See Coghlan*

27   *v. American Seafoods Co. LLC*, 413 F.3d 1090, 1096-98 (9th Cir. 2005). In this case, such a

28   presumption would be insufficient to warrant summary judgment because Mattioda's testimony

United States District Court
Northern District of California

10

1  regarding his conversations with Dotson would give rise to a genuine issue of material fact.  *See*

2  *Lewis v. Peakes*, No. CV F 09-0318 LJO DLB, 2010 WL 5059607, at *7 (E.D. Cal. Dec. 3, 2010).

3      Based on a review of the evidence in the record before it, the Court concludes that

4  Mattioda has made a prima facie showing that his performance review was linked to his disability

5  because the "meets expectations" rating was based in part on his failure to attend the ACS

6  meeting, which, according to Mattioda, his reviewing supervisor knew he had been advised not to

7  attend for medical reasons.

8                  ### 2.      Non-discriminatory justification

9      Because Mattioda has made a prima facie case that his second-highest rating constitutes

10  disability-based discrimination, the burden shifts to NASA to show a non-discriminatory

11  justification for the performance rating.  NASA argues that the agency articulated legitimate, non-

12  discriminatory reasons for his performance review and that his performance was weighed against

13  NASA's standard for employees in the same role as Mattioda.  Reply at 4.  NASA also

14  emphasizes that Dotson accommodated Mattioda's late request for reconsideration of the

15  performance review.  *See* Ex. E.

16      These arguments do not adequately address Mattioda's prima facie case.  It is true that

17  there is evidence that NASA's performance standards looked at employees' participation in

18  conferences.  *See, e.g.,* Ex. D at PDF p. 67.  However, that misses the point that according to

19  Mattioda, the reason he could not attend the ACS conference was due to his disability.  Moreover,

20  the result of Dotson's reconsideration was her determination that the "meets expectations" rating

21  should not be raised.  Ex. F.  The fact that Dotson reconsidered and reaffirmed the 2015

22  performance review does not address Mattioda's prima face case that Dotson lowered his

23  performance rating in part based on his failure to attend the ACS conference, which in turn was

24  due to his disability.

25                  ### 3.      Pretext

26      The Court finds that NASA has not rebutted Mattioda's prima facie case of disability-

27  based discrimination based on the 2015 performance review and therefore does not reach the issue

28  of pretext.

11

1    For the reasons discussed, NASA's motion for summary judgment regarding Mattioda's

2    claim that the 2015 performance review constituted disability-based discrimination is **DENIED**.

3        **B.    Mattioda's 2016 transfer to SSA (Plaintiff's Events 2 and 8)**

4        In May 2016, Mattioda's third-level supervisor, Dr. Michael Bicay, offered to coordinate a

5    voluntary six-month transfer from Mattioda's position in the SSA branch to the SST branch.

6    Ex. R at PDF p. 168; Ex. S.  This offer followed Mattioda's filing of multiple EEO complaints

7    against Dotson and Dr. Timothy Lee.  Bicay made the offer to create a "safe space," "defuse some

8    of the tensions," and "help calm[] the waters."  *Id.* at PDF pp. 166-67; Ex. U at PDF pp. 184-85.[5]

9    Bicay told Mattioda that the transfer was voluntary and would proceed only if Mattioda consented.

10   Ex. S; *see also* Ex. R at PDF p. 168.  Mattioda accepted the transfer and requested to extend it

11   once the initial six-month period expired.  Exs. R, S, T.

12       NASA argues that Mattioda cannot establish a prima facie case that his transfer to the SST

13   branch resulted from disability-based discrimination because it was voluntary and he suffered no

14   tangible negative effects on the terms and conditions of his employment.  Motion at 13-14.

15   Although Mattioda's managers changed upon his transfer to the SST branch, his title, salary,

16   hours, and responsibilities remained largely the same.  Ex. A at PDF p. 16 (99:4-18).  As the six-

17   month transfer was coming to an end, Bicay asked Mattioda if he wanted to transfer back to SSA

18   and clarified that Dotson was no longer the manager of SSA.  Ex. T.  Mattioda responded that he

19   liked his position in SST and preferred to remain there.  *Id.*  Mattioda testified that his "work

20   environment substantially improved" after the transfer.  Ex. A at PDF p. 28 (159:11-12).

21       Although Mattioda argues that "[t]ransferring the victim to a less desirable position 'may

22

23   [5] In support of its summary judgment motion, NASA submitted a number of affidavits submitted
     in the proceedings on Mattioda's EEO claims.  A summary judgment motion may properly be
24   based on affidavits.  *See* Fed. R. Civ. Proc. 56(c)(1)(A); *see also In Suk Kim v. Vilsack*, No. C 10-
     2101 CW, 2012 WL 368477, at *2 n. 5 (N.D. Cal. Feb. 3, 2012).  Mattioda did not include any
25   evidentiary objections to the EEO affidavits in his Opposition, as required under the Local Rules.
     Civ. L.R. 7-3(a).  At the hearing, Mattioda's counsel agreed that the affidavits are part of the
26   record, although he stated that the content of an affidavit may be objectionable if it contains
     hearsay or lacks foundation.  Where the Court relies on an EEO affidavit in this Order, it has
27   found that that the affidavit is made on personal knowledge, sets out facts that would be
     admissible in evidence, and shows that the affiant or declarant is competent to testify on the
28   matters stated, as required under Fed. R. Civ. Proc. 56(c)(4), and that any objection of Mattioda to
     that evidence has been waived or is overruled.

United States District Court
Northern District of California

United States District Court
Northern District of California

itself be the basis for employer liability'" (Opp. at 8 (quoting *Swenson v. Potter,* 271 F.3d 1184, 1194 (9th Cir. 2001)), the case cited by Mattioda makes clear that "not every transfer adversely affects the victim's employment." *Swenson*, 271 F.3d at 1194. "Whether the position to which the employee is moved is less desirable is determined by objective factors that include, but are not limited to, the terms of employment." *Id.* Here, Mattioda has presented no evidence that the position in the SST branch to which he was transferred was objectively less desirable than his previous position; to the contrary, the evidence is that the transfer did not result in a material change to terms and conditions of his employment. Accordingly, the transfer does not constitute an adverse employment event as necessary to establish a prima facie case of disability discrimination. *Green*, 2021 WL 3810243, at *32; *see also Valero v. San Francisco State Univ.*, No. 12-cv-04744-TEH, 2014 WL 1339618, at *3 (N.D. Cal. Apr. 2, 2014) (finding on summary judgment that job transfer did not constitute an adverse employment action where plaintiff failed to provide support for claim that transfer was adverse to her).

Even assuming that Mattioda has made a prima facie case based on his transfer, NASA has demonstrated that the transfer was made for the legitimate purpose of improving Mattioda's work environment. Bicay offered the transfer as a way of "calming the waters" following Mattioda's EEO complaints against his supervisors in the SSA branch. Ex. S. Moreover, the transfer was supported by NASA policy, which required supervisors/management to "provide interim relief, as necessary, during fact-finding" associated with harassment or EEO cases. *See* Ex. R at PDF p. 164 (citing NPR 3713.3); *see also id.* at PDF p. 168. There is also evidence that Mattioda agreed to the transfer. Exs. R, S, T. An effort to avoid further difficulties among co-workers, as well as defusing an interpersonal conflict in the workplace to allow the company to appropriately investigate the matter, are legitimate, non-discriminatory reasons to transfer an employee. *See, e.g., Smith v. New York and Presbyterian Hospital,* 440 F. Supp. 3d 303, 335 (S.D.N.Y. 2020); *E.E.O.C. v. Southwestern Furniture of Wisconsin, LLC*, 703 F. Supp. 2d 971, 977-978 (D. Ariz. 2010). Under the circumstances of this case, it was reasonable for the agency to offer Mattioda a voluntary transfer to a comparable job as a way to address conflicts between Mattioda and his supervisors.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mattioda has failed to demonstrate that the legitimate reasons offered for his transfer were a pretext. He notes that Bicay transferred him (the complainer) but refused to transfer Dotson (the non-disabled alleged harasser). Opp. at 7. However, the mere fact that Mattioda, rather than Dotson, was transferred does not demonstrate pretext. "If it decides to separate the two employees in the workplace, the employer may properly consider the relative ease of moving them and their respective importance to its business operations" and "[t]he employer has wide discretion in choosing how to minimize contact between the two employees, so long as the accuser is not moved to an objectively less desirable position." *Swenson,* 271 F.3d at 1194. Here, as discussed, Mattioda has not shown that the new position was objectively less desirable. Mattioda also claims that he "reluctantly agreed" to the transfer. Mattioda Decl. ¶ 55. However, the evidence shows that Mattioda agreed to the transfer, and in fact had previously requested a transfer. Exs. R, S, T; Mattioda Decl. ¶ 42. Under the circumstances of this case, Mattioda has not carried his burden of showing, either directly or indirectly, that NASA's proffered reasons for the transfer are pretextual.

Accordingly, NASA's motion for summary judgment on the issue of Mattioda's transfer in **GRANTED**.

C.    **Selection of Sandford over Mattioda for Senior Scientist Position (Plaintiff's Events 13, 14)**

In 2017, a senior scientist ("ST") position opened at the NASA ARC. Ex. AA. Dr. Tu, the ARC director, asked another NASA scientist, Dr. Zornetzer, to lead a panel evaluating all candidates. Ex. BB at PDF p. 243. Tu would then recommend a final candidate to NASA headquarters based on the panel's evaluation. *Id.* The panel consisted of Mr. Mark Fonda, Dr. Max Bernstein, and Dr. Jaya Bajpayee. *See* Ex. CC at PDF p. 251; Ex. FF at PDF p. 271; Mattioda Decl. ¶¶ 76, 79, 98. Bajpayee replaced Lee on the panel because Lee recused himself after Mattioda applied for the ST position. Ex. CC at PDF p. 251. Once the human resources department screened the initial seven applicants for minimum qualifications, three applicants advanced as finalists: Dr. Mattioda, Dr. Scott Sandford, and Dr. Farid Salama. Mattioda Decl. ¶ 86; Ex. FF at PDF p. 271-72. Each member of the panel individually rated finalist Sandford

1    higher than Mattioda based on seven outlined criteria.  Ex. 23 at PDF p. 271;  Ex. EE at PDF

2    p. 267; Ex. GG.  The panel then convened to discuss all candidates and unanimously presented

3    Sandford to Tu as highly selectable.  Ex. FF.  Tu reviewed all the finalists before making his

4    decision and selected Sandford as his nominee for the ST position.  Ex. BB at PDF pp. 243-244.

### 1.    Prima facie case

6    NASA argues that Mattioda has failed to satisfy the requirement that he show that

7    disability motivated his non-selection for the ST position in order to make out a prima facie case

8    of disability discrimination.  Motion at 15 (citing *Gaytan v. Solis,* No. C 07-6367 SBA, 2012 WL

9    2367822, at *5 (N.D. Cal. June 21, 2012)).  Mattioda points to several portions of the record to

10   support his claim that his non-selection was based on his disability.  Opp. at 4-14.  The Court now

11   summarizes each of Mattioda's arguments, then considers them together in determining whether

12   he has stated a prima facie case of disability-based discrimination in connection with NASA's

13   selection of another candidate for the ST position.

### a.    Tu's diversity criteria

15   Mattioda points to evidence that Tu wanted scientists to compete for the ST position in

16   order to provide for "diversity of our ST Positions."  Mattioda Dec. ¶ 64; Ex. 13.  Mattioda states

17   that when he applied for the position, he specified that he was eligible under Schedule A, "an

18   affirmative action Schedule for federal employees with disabilities."  Mattioda ¶ 83.  Mattioda

19   claims NASA "lost" the Schedule A disability status information and never notified the panel

20   members of his diversity status.  *Id.* ¶¶ 84-85.  Three of the panel members testified that they were

21   not told that Tu wanted to use diversity criteria.  Ex. 32 (Fonda Depo.) at PDF p. 38 (51:10-14);

22   Ex. 36 (Bernstein Depo.) at PDF pp. 61-62 (87:19-88:4); Ex. 37 (Zornetzer Depo.) at PDF p. 67

23   (70:15-20.

### b.    H-index ratings

25   One factor that both Tu and the selection panel considered in recommending Sandford for

26   the ST position was his citations index, or "h-index."  Ex. BB at PDF p. 244; Ex. CC at PDF

27   p. 255.  As Mattioda describes it, an "h-index" is "used to synthesize information about a research

28   scientist's history of scientific publications."  Mattioda Decl. ¶ 86; *see also* Ex. B (Plaintiff's

United States District Court
Northern District of California

15

1    Interrogatory Responses) at PDF p. 49 ("The h-index is defined as the maximum value of *h* such

2    that the given author has published at least *h* papers that have each been cited at least *h* times"

3    (emphasis in original)).  Mattioda attacks the committee's use of the h-index on several grounds.

4    First, Mattioda suggests that it was improper for the panel to consider the finalists' h-index ratings

5    at all.  Opp. at 10.  The other two finalists for the ST position self-reported their h-index numbers

6    when they applied for the position, but Mattioda did not.  *Id.*  Mattioda notes that NASA's June 5,

7    2017, announcement of the ST position did not identify an applicant's "h-index" of publication

8    citations and listings as a qualification factor, and NASA instead stated that "the quality and

9    scientific/technical significance" of an applicant's publications and speaking engagements was

10   more important than the number.  *Id.* ¶ 77; Ex. 20; *see also* Ex. 15.  In addition, Mattioda argues

11   that five Evaluation Criteria and two General Criteria for the ST Position did not mention an h-

12   index.  Opp. at 10.  Mattioda also states that Dr. Howell, who is currently a Senior Scientist in the

13   Space Science Division and was formerly Chief of the Space Science and Astronomy Division at

14   ARC, "has openly criticized the H-Index as not used on any of his selection panels and 'not

15   critical' as a metric for selecting scientists." *Id.* at 11; Ex. 28 at PDF p. 3 (63:4-14); Ex. KK.

16          Second, Mattioda challenges the circumstances under which the panel came to consider his

17   h-index.  As mentioned, unlike the other two finalists, Mattioda did not initially supply an h-index

18   with his application.  However, Mattioda presents evidence that shortly before Lee recused

19   himself from the selection panel, Lee undertook to determine the h-index for each of the three

20   finalists and delivered the h-index numbers to Zornetzer. Ex. 22.  Lee's findings showed Sandford

21   as having the highest h-index and Mattioda as having the lowest.  *Id.*

22          Mattioda claims that both Lee's involvement in calculating the h-index and the way he

23   calculated it support his discrimination claims.  In making this argument, Mattioda invokes the

24   "cat's paw theory."  Opp. at 13.  Under that theory, "even if [an] employee with bias was not the

25   final decisionmaker, the plaintiff can establish a causal link by proving that 'the biased [employee]

26   influenced or was involved in the decision or decisionmaking process." *France v. Johnson*, 795

27   F.3d 1170, 1176 (9th Cir. 2015), as amended on reh'g (Oct. 14, 2015) (quoting *Poland v.

28   Chertoff,* 494 F.3d 1174, 1182 (9th Cir. 2007)).  Thus, even if the biased employee was not the

United States District Court
Northern District of California

16

1   principal decisionmaker, the biased employee's improper motive will be imputed to the employer

2   if the biased employee "influenced, affected, or was involved in the adverse employment

3   decision." *Poland*, 494 F.3d at 1183.  Conversely, "if an adverse employment action is the

4   consequence of an entirely independent investigation by the employer, the animus of the [biased]

5   employee is not imputed to the employer." *Id.*  Mattioda argues that Lee "used the Panel as his

6   'cat's paw' to generate the outcome he wanted."  Opp. at 13.

7         Mattioda also claims that Lee's method of calculating the h-index was improper because it

8   "includes data from years where Mattioda was either recovering from surgery, or on leave related

9   to his disabilities."  Mattioda Decl. ¶¶ 91, 94.  Mattioda argues that as a result of this failure to

10   "equalize" his years of publication contributions to those of Sandford, the h-index "was 'rigged' to

11   benefit a person without disability leave."  Opp. at 11.  Mattioda states that "[a] better criterion

12   might have been the "M-index," which measures publications by comparable periods of time, but

13   Tim Lee did not offer that data to the Panel."  *Id.*; Mattioda Decl. ¶ 92.

14   **c.      Deep space mission experience**

15         Tu and the selection panel also credited Sandford's deep space mission experience.  Ex.

16   BB at PDF p. 244-245; Ex. FF at PDF p. 271.  Mattioda argues that NASA's June 5, 2017,

17   announcement of the ST position mentioned "supporting space mission experience" but did not

18   mention "deep space" mission experience.  Opp. at 11-12; Mattioda Decl. ¶¶ 77-78.  Mattioda

19   further states that Dr. Howell "has also never heard the term 'deep space mission experience.'"

20   Opp. at 11; Ex. 28 at PDF p. 4 (63:15-21).

21   **d.      Panel composition**

22         Mattioda also challenges the composition of the panel, arguing that some panel members

23   were biased against him or in favor of Sandford.  As discussed above, Mattioda argues that Lee

24   tainted the panel, despite recusing himself, by delivering h-index data to the panel shortly before

25   recusal.  Opp. at 11; *see also* Mattioda Decl. ¶¶ 88-90.  Mattioda also argues that Fonda was left

26   on the panel despite prejudice against Mattioda, and Bernstein was left on the panel despite his

27   close working relationship with Sandford.  Opp. at 10-11.  In an effort to demonstrate the bias of

28   certain panel members, Mattioda argues that the one "obviously neutral" panelist, Bajpayee, rated

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    Mattioda as "essentially equal" to Sandford and would have given Mattioda an opportunity to be

2    interviewed for the position.  *Id.* at 12 (citing Mattioda Decl. ¶ 100).[6]

3                         **e.    Panel methodology**

4            Mattioda argues that the testimony of members of the ST selection panel "shows each took

5    an entirely inconsistent approach to rating each candidate under the seven criteria established by

6    NASA" and the panel's evaluation sheets "provide numbers that are literally '***all over the place.***'"

7    Opp. at 12 (emphasis in original); *see also* Mattioda Decl. ¶ 100.  Mattioda also complains that the

8    selection panel did not interview any of the applicants for the ST position and states that "[a]ny

9    questions the Panel might have had regarding my time spent recovering from surgery, or my

10   inability to publish scientific research during that time, could have been elucidated by interviews."

11   Mattioda Decl. ¶ 101.  Mattioda contrasts his experience with applying for the ST position as ARC

12   with his later application for a ST position at the George C. Marshall Space Flight Center

13   ("MSFC") in Huntsville, Alabama, in which he was evaluated as "highly qualified (highly

14   selectable)" and was given an interview for the position.  Opp. at 13-14; Mattioda Decl. ¶¶ 115-

15   116; Ex. 27.

16

17                       **f.    Conclusion on prima facie case**

18           Mattioda's wide-ranging complaints about the selection of Sandford over him for the ST

19   position focus on process issues and do not establish a connection between that hiring decision and

20   Mattioda's disability.  Mattioda has presented no direct evidence of discrimination, such as

21   discriminatory comments made by selection panel members.

22           Mattioda makes much of Lee's supposed influence over the selection panel.  Mattioda has

23   failed to establish the predicate of the cat's paw theory:  that Lee had a discriminatory animus.

24   But even assuming, for purposes of this motion, that Lee had such bias, there is no evidence that

25   the selection panel was manipulated by Lee's alleged discriminatory animus into selecting

26   _____

27   [6] The cited paragraph of Mattioda's declaration discusses the rating spreadsheets filled out by the
     selection panel members.  Mattioda Decl. ¶ 100.  In those spreadsheets, Bajpayee gave both
     Mattioda and Sandford a "4" rating overall but rated Mattioda lower than Sandford on one
28   evaluation criteria.  Ex. 23 at PDF pp. 265-266, 271.  In an EEO affidavit, Bajpayee stated that,
     "[o]f the three candidates, I rated Dr. Sandford the highest."  Ex. EE at PDF p. 267.

                                            18

United States District Court
Northern District of California

1    Sandford rather than Mattioda for the ST position.  Mattioda has not shown that Lee used a

2    different method for calculating Mattioda's h-index than used for the other candidates; in fact,

3    Mattioda notes that Lee's calculations of the h-index for Sandford and Salama were lower than

4    those candidates' self-reported scores.  Mattioda Decl. ¶ 95.  Although Mattioda disagrees with the

5    methodology Lee used to determine his h-index, Mattioda has not demonstrated that Lee supplied

6    inaccurate information.  As Mattioda explains, the h-index "roughly measures the number of

7    publications produced by a particular scientist over the years, and that number is directly affected

8    by (1) the number of years of publishing, (2) the number of post-doctoral researchers assigned to a

9    scientist, and (3) the number of projects approved by NASA for a given scientist."  *Id.* ¶ 91.

10   Mattioda admits that compared to Dr. Sandford, he had fewer years and active months as a

11   researcher, fewer publications via post-doctoral candidates, and fewer approved research projects.

12   *Id.* ¶¶ 91, 96-97.  It is therefore not surprising that Sandford's h-index was higher than Mattioda's

13   score.

14          Although Mattioda explains that the h-index can be calculated in multiple ways and

15   complains that Lee's calculation method resulted in the "lowest possible" calculation of his h-

16   index (*id.* ¶¶ 92-93), he has not shown that an alternative methodology would have given him a

17   higher h-index than Sandford.  Mattioda also argues that the h-index "merely considers quantity"

18   and not quality of an author's scientific publications and points out that the job listing for the ST

19   position did not expressly identify the h-index as a factor.  *Id.* ¶ 96.  From this and Mattioda's

20   other arguments, it is clear that in Mattioda's opinion, the selection panel should have given the h-

21   index less, if any weight, but he has not shown that the use of the h-index was improper or

22   discriminatory.  NASA, meanwhile, has shown that assessment factors for the job included "[h]igh

23   number of citations in scientific/engineering literature over an extended period" and that the

24   agency has considered candidates' h-index information in other selection decisions.  Ex. XX at 2

25   (NASA ST Evaluation Criteria); Ex. HHH (Hollingsworth Depo.) at PDF pp. 86-87; *see also*

26   Ex. 23 at PDF p. 266 (listing "[p]ublications and information transfer" as an evaluation criteria for

27   the ST position).

28          Similarly, Mattioda has not shown anything discriminatory about the fact that Tu and the

1    selection panel credited Sandford's deep space mission experience.  Zornetzer explained that the

2    panel felt Sandford's experience with deep space missions "represented a more difficult type of

3    problem to solve than those in low earth orbit missions, where [Mattioda] was making his

4    accomplishments."  Ex. CC at PDF p. 254.  Even if the job description for the ST position did not

5    expressly require deep space mission experience, it was not improper for the selection panel to

6    rank a candidate who had such experience higher than a candidate who lacked such experience for

7    reasons unrelated to his disability.

8         According to Mattioda, the panel chair (Zornetzer) and two panel members (Fonda and

9    Bernstein) knew of Mattioda's disability.  Mattioda Decl. ¶ 100.  However, the panelists who

10   knew about the disability independently came to the same recommendations as Bajpayee, who

11   Mattioda characterizes as the "one obviously neutral" panel member:  all concluded that Sandford

12   was the most qualified.  *See* Opp. at 12; Ex. EE at PDF p. 267; Ex. FF; Ex. GG; Ex. 23 at PDF

13   pp. 265-266, 271.

14        The fact that the selection panel for a different ST position for which Mattioda applied at

15   MSFC ranked Mattioda somewhat differently and included an interview in the hiring process does

16   not establish that the ARC selection panel discriminated against Mattioda when it selected

17   Sandford for the ARC ST position, when Mattioda himself admits that Sandford had greater

18   experience than Mattioda in several areas the ARC panel considered.

19        Several of Mattioda's arguments amount to a complaint that he was not given a preference

20   for the ST position despite his disability.  For example, Mattioda states that the committee was not

21   told that he was disabled and did not know of or use Tu's diversity criteria.  Opp. at 10, 12.

22   Mattioda also argues that the h-index scores should have been adjusted to reflect the fact that his

23   "active months" as a researcher were reduced because he had to take off time to recover from

24   surgery or deal with other consequences of his disabilities.  Mattioda Decl. ¶¶ 91, 94.  Mattioda

25   cites no authority requiring an employer to "equalize" the experience of disabled and non-disabled

26   job candidates in the way he proposes.  The facts adduced by Mattioda do not state a claim for

27   disability-based discrimination.

28   ////

United States District Court
Northern District of California

20

Mattioda clearly believes he should have been selected for the ST position instead of Sandford.  However, Mattioda's disagreement with the process and the outcome does not amount to a prima facie case of disability-based discrimination.

### 2. Non-discriminatory justification

Even if Mattioda had made a prima facie case, NASA established a non-discriminatory justification for the hiring decision because the members of the hiring committee independently came to the unanimous decision that Sandford was superior candidate.  The ST position was an elite and highly competitive post.  *See* Ex. AA (job listing); Ex. BB at PDF p. 243 (explanation by Tu that "[w]e do not have many of these [ST] positions, and ARC has approximately 8 ST positions out of over 1100 civil servants).  Mattioda was selected as one of three finalists and was ranked second to Sandford and higher than the third candidate.  As discussed above, Mattioda concedes that Sandford had superior qualifications on several criteria considered in the hiring process.  As such, NASA had a non-discriminatory justification for selecting Sandford rather than Mattioda for the ST position.

### 3. Pretext

Mattioda has presented no evidence to directly or indirectly demonstrate that NASA's justification for its actions is a pretext.  For example, he has not shown he was the "clearly superior" candidate for the ST position.  *See Peters v. Shamrock Foods Co.*, 262 Fed. Appx. 30, 33 (9th Cir. 2007).  Accordingly, Mattioda has failed to rebut NASA's legitimate reasons for the hiring decision for the ST position.

Accordingly, the Court **GRANTS** NASA's motion for summary judgment on the issue of Mattioda's non-selection for the ST position.

### D. 2016 and 2017 Disputes re Travel Requests (Plaintiff's Events 6, 7, and 12)

According to Mattioda, his disability requires him to travel by premium class when he flies so that he may stand and stretch during travel.  Mattioda Decl. ¶ 5.  Mattioda claims that on two occasions, he was asked to obtain certain approvals or information in connection with his travel requests.  Opp. at 6-7, 9.  First, on May 12, 2016, Dotson required Mattioda to satisfy three requirements prior to approval of his travel accommodations:  (1) sufficient funds were required to

21

1  be available; (2) the manager of the travel had to approve use of the funds; and (3) the fund

2  manager had to submit a "not to exceed" budget for Mattioda.  *Id.* at 6-7; Mattioda Decl. ¶ 49; Ex.

3  7.  Mattioda claims that these requirements were exclusive to him and violated NASA policy

4  requiring managers to approve disability-related travel.  Opp. at 6; *see also* Ex. 41 (NASA

5  Procedural Requirement 3713.1B); Ex. 42 (NASA Interim Directive 9700.103).  Mattioda also

6  claims that Dotson had direct assistance from Lee in creating these requirements.  Opp. at 6 (citing

7  Ex. 34 at PDF p. 47 (94:6-15); Mattioda Decl. ¶ 49).

8         Second, on February 15, 2017, Mattioda submitted his component of the Lab Astrophysics

9  Work Package ("Lab Astro WP") to Lee, who responded by pointing out that Mattioda had failed

10  to include any travel funds in his budget.  Opp. at 9; Mattioda Decl. ¶ 67; Ex. 14.  In response to a

11  question from Mattioda about whether the travel funds needed to include "RA [reasonable

12  accommodation] travel expenses," Lee told Mattioda that the RA expenses needed to be included.

13  Opp. at 9; Mattioda Decl. ¶ 67; Ex. 14.  Mattioda claims that as a result of this requirement, any

14  person with a disability, such as himself, was required to both identify himself as having a

15  disability and pay for his own travel accommodations.  Opp. at 9; Mattioda Decl. ¶ 67.

16              **1.**      **Prima facie case**

17         As a preliminary matter, NASA argues that the Court dismissed Mattioda's claims related

18  to travel funding as part of the dismissal of his claims for failure to provide reasonable

19  accommodation.  Motion at 21-22.  Although NASA is correct that the Court dismissed

20  Mattioda's RA claims, the Court will analyze Mattioda's travel-related claims to determine

21  whether they give rise to a triable issue of fact on his surviving discrimination claim.

22         NASA argues that requiring Mattioda to seek fund manager approval and provide a travel

23  budget are not adverse employment events because they do not affect the "terms, privileges,

24  conditions or duration of a plaintiff's job."  Motion at 22 (citation omitted).  The record does not

25  support Mattioda's assertion that a disabled person such as himself would have to "pay for his

26  own travel accommodations."  Opp. at 9; Mattioda Decl. ¶ 67.  The record does reflect that the

27  travel-related issues identified by Mattioda stem from the fact that because travel was funded

28  through grants rather than from a central account, he was required to obtain approvals and provide

information concerning his request for travel RA (*i.e.,* premium air travel).  Plaintiff notes that ARC Deputy Director Dr. Thomas Edwards in his October 4, 2016, decision on Mattioda's harassment complaint found that there was a "shortcoming [in] the Agency's policies and procedure" because "[t]here is no clear approach to handle the financial repercussions of RA findings, and so managers and employees can be left lacking the tools needed to provide accommodations."  Ex. 12 at PDF p. 129; *see also* Ex. 14 at PDF p. 141 (February 15, 2017, email from Lee to Mattioda stating that "the travel funds for RA need to be included [in the Lab Astro WP budget] until such time that ARC implements a Centerwide fund to cover that (which they have not done and I don't know if they will).").  As discussed above, not every employment decision amounts to an adverse employment action.  However, under the circumstances here, the Court will assume for purposes of the motion for summary judgment that Mattioda has established a prima facie case of disability-based discrimination because the travel-related issues he identifies appear to have been related to his request for RA and therefore have some connection to his disability.

## 2.  Non-discriminatory justification

Even assuming Mattioda has made out a prima facie case, NASA offers a non-discriminatory justification for the travel-related requirements identified by Mattioda.  Mattioda's work was funded by a grant managed by Sandford, and his travel funds had to come from that grant rather than a central travel budget.  Ex. N at PDF p. 136.  As a result, the manager of each grant had the authority to allocate travel funds.  *Id.*  NASA's new procedures for travel upgrade accommodations instituted in September 2015 required a supervisor signature approving the request but did not account for work structured like that of Mattioda.  *Id.*; Ex. J.  Specifically, Dotson was Mattioda's supervisor and the person who had to approve his travel requests, but she did not control the funding of his work.  *See* Ex. L at PDF p. 111.  When Dotson was first asked to sign off on Mattioda's request for premium air travel under the new procedures, she was concerned about committing funds over which she did not have authority.  *Id.*; Ex. N at PDF p. 135-36.  The record shows that Dotson worked to obtain proper approval of Mattioda's travel request.  *See* Exs. K-N.

1    Similarly, NASA has shown a non-discriminatory reason for Lee's 2017 request that

2    Mattioda include travel funds in his budget.  Lee claims this information was required because the

3    only way his division had to fund travel was to include it in grants; there was no other budgeted

4    "bucket" of travel funds at that time.  Ex. V at PDF p. 194.  The RA portion of the travel budget

5    was not broken out in detail and had no name associated with it.  *Id.; see also* Ex. Y.  According to

6    Lee, everyone other than Mattioda provided the necessary detail regarding travel budgets.  Ex. V

7    at PDF p. 195.  When Lee asked Mattioda for the information, Mattioda responded:  "My

8    apologies, travel was in the earlier version but it seems to have dropped out in the final version."

9    Ex. 14 at PDF p. 140.

10    The Court concludes that NASA has shown that a non-discriminatory justification for the

11    travel authorization and budgeting requirements upon which Mattioda relies.  Although some of

12    the complications noted by Dotson and Lee regarding NASA's procedures might not have existed

13    had RA travel been funded in a different manner, such as through a central account, the undisputed

14    fact that travel was funded through grant money makes the challenged requests for information

15    and approvals reasonable.

16    ### 3.    Pretext

17    Mattioda has not shown NASA's justifications to be pretextual.  He has offered no

18    evidence, either direct or indirect, that NASA's travel funding structure and procedure had a

19    discriminatory motive or that NASA's proffered explanations are unworthy of credence.

20    Accordingly, NASA's motion for summary judgment on the issue of Mattioda's travel

21    requests is **GRANTED**.

22    ### E.    Dotson Question About Grant Funds for Fabrication Project (Plaintiff's Event 4)

23    In April 2016, Mattioda emailed Dotson, who also managed the ARC machination lab, to

24    request her help with issues he was having with the lab in completing a fabrication project.  Ex. Q

25    at PDF p. 152.  Dotson replied that if Mattioda had funding sources for the project, that would

26    assist her in finding a way to expedite the project.  *Id.* at PDF p. 153.  Because the fabrication

27    project was connected to a project under Sandford's grant, he was brought into the conversation,

28

United States District Court
Northern District of California

and he confirmed the possible availability of funds.  Ex. N at PDF p. 133; Ex. O at PDF pp. 142-143.

Mattioda argues that this event constitutes disability-based discrimination because Dotson required him to obtain the permission of Sandford, the Principal Investigator, to use the same manufacturing (fabrication) funds that others without disabilities could use without approval. Opp. at 5-6; Mattioda Decl. ¶ 46.  The record shows that on April 27, 2016, Mattioda requested Dotson's assistance in making the machination lab complete his fabrication project, and she responded as follows:

> Thank you for letting me know about your challenges getting work on a timely basis from AIDL [Airborne Instrument Development Lab].  Do you have funding for the AIDL work?  If so, that gives us a lot more options to identify and implement burst capability.  Let me know and we'll work to identify viable solutions.

Ex. Q at PDF pp. 153.  Mattioda copied Sandford on his request to Dotson and identified Sandford's NAI CAN 7 grant as a possible source of funding; Sandford indicated that there may be such funding available.  *Id.* at PDF pp. 152, 156-157.  Mattioda has not provided any evidence in support of his assertion that Dotson "demanded" that he obtain Sandford's approval or any evidence of differential treatment, despite his assertions otherwise.  There is simply no evidence linking this event to Mattioda's disability.  As such, Mattioda has failed to carry his burden of establishing a prima facie case of disability-based discrimination based on this event.  In addition, to the extent Mattioda alleges that the requirement that he obtain fund manager approval was imposed in retaliation for his EEO claims (*see* Mattioda Decl. ¶ 52), that argument fails because the Court has dismissed Mattioda's retaliation claim.  *See* April 26 Order at 5-7.

Even if Mattioda had made a prima facie case, the email chain submitted by NASA rebuts any prima facie showing.  *See* Ex. Q.  Consistent with these emails, there is evidence that although the fabrication shop as a standard practice worked to fit in small jobs without asking for funds, it did request funding for larger jobs and sometimes outsourced the work.  Ex. N at PDF p. 133. Under these circumstances, Dotson had a legitimate, non-discriminatory reason for asking Mattioda if grant money was available because, as she explained to Mattioda, it would give them

"more options" for doing the work.  In addition, NASA has presented evidence that on Sandford's grant, everyone was required to obtain fund manager permission for certain expenses, even though previously Mattioda may have been on a different grant where the money was divided between people and they could spend it how they saw fit.  Ex. O at PDF pp. 142-144.

Mattioda has failed to show that NASA's justifications for the funding requirements are a pretext.  He has presented no evidence that directly or indirectly undercuts to stated reasons for NASA's action.

Accordingly, NASA's motion for summary judgment on the issue of the funding request for the fabrication project is **GRANTED**.

### F. Various Comments About Mattioda and Exclusion of Mattioda from Work Meetings (Plaintiff's Events 3, 5, 9, 10, 11)

In his opposition to the motion for summary judgment, Mattioda cites as incidents of disability-based discrimination various comments by Lee and Dotson that Mattioda claims characterized him as lazy, incompetent, and ineffective.  Opp. at 5-8; Mattioda Decl. ¶¶ 44, 48, 61, 65.  Mattioda also complains about his exclusion from a work meeting regarding the Lab Astro WP.  Opp. at 8-9, 22; Mattioda Decl. ¶ 66.  NASA argues that these events are no longer at issue in light of the Court's previous rulings and Mattioda's list of issues in the June 1, 2021 Joint Case Management Statement.  Reply at 2-3 (citing Dkt. 34).

Even if the Court considers these events, Mattioda has not established a prima facie case of disability-based discrimination because he has not presented evidence tying these comments and his exclusion from a meeting to his disability.  The comments cited by Mattioda, as well as his exclusion from a work meeting, did not expressly refer to Mattioda's disability, and for several of them Mattioda does not even attempt to explain how they imply a connection to his disability. *See, e.g.,* Mattioda Decl. ¶¶ 44 ("Good luck getting Andy to do anything"; "Andy was Deputy Branch Chief because he couldn't get any funding on his own"), 66 (exclusion of Mattioda from a meeting between Lee and Dr. Christian Boersma regarding the Lab Astro WP).  With regard to one comment by Lee in a February 2017 meeting regarding Mattioda's proposal for overseeing Boersma's work ("Well, you do realize you are going to have to manage him!?"), Mattioda asserts

United States District Court
Northern District of California

1   that "Dr. Lee's shouting implied I was incapable, because of my disabilities, or too lazy to manage

2   Dr. Boersma."  *Id.* ¶ 65.  However, this is speculation by Mattioda that the comment was linked to

3   his disability, it is unsupported by evidence, and it is not a reasonable inference from the comment

4   given the context in which it was made.  Mattioda tries to link other comments to the effect that he

5   was a "troublemaker" to his EEO complaints.  *See id.* ¶¶ 48, 61.  Again, however, Mattioda has

6   failed to provide evidence that these comments were related to his disability and not reflective of

7   other issues, such as non-disability-related personality conflicts between Mattioda and his

8   managers.

9          Evidence of "stray remarks" is not by itself sufficient to establish a claim for disability-

10   based discrimination.  *Floyd v. County of Maricopa*, No. 16-15450, 2017 WL 2480738, at *2 (9th

11   Cir. June 8, 2017).  This is especially so when the remarks are not tied directly to an adverse

12   employment event affecting the employee.  *See Nids v. Schindler Elevator Corp.* 113 F.3d 912,

13   918-19 (9th Cir. 1996).  In addition, to the extent Mattioda cites such comments as evidence that

14   his managers retaliated against him for filing EEO claims, that argument fails because the Court

15   has dismissed Mattioda's retaliation claim.  *See* April 26 Order at 5-6.

16          Accordingly, NASA's motion for summary judgment on the issue of the specified

17   comments about Mattioda and his exclusion from a work meeting is **GRANTED.**

18          **G.      2018 Non-Selection of Mattioda's Preferred Post-Doctoral Candidate**

19          In the June 21, 2021, Joint Case Management Statement, which was filed after the Court

20   issued orders on the motions to dismiss, Mattioda listed as an incident of disability discrimination

21   "selection of post-doctoral support personnel."  *See* Dkt. 34 at 2.  NASA discusses this incident,

22   which involved the 2018 selection by a NASA panel of a post-doctoral candidate other than the

23   one recommended by Mattioda, in its motion for summary judgment.  Motion at 6, 19-21.

24   Mattioda does not address the non-selection of his preferred post-doctoral candidate in his

25   opposition brief.  Accordingly, NASA's motion for summary judgment on the issue of the

26   selection of the post-doctoral candidate is **GRANTED.**

27   ////

28   ////

**IV.      CONCLUSION**

For the reasons discussed above, NASA's motion for summary judgment on Mattioda's claim that his 2015 performance review constituted disability-based discrimination is **DENIED**. In all other respects, NASA's motion for summary judgment is **GRANTED**.

**SO ORDERED.**

Dated: February 10, 2022

SUSAN VAN KEULEN
United States Magistrate Judge

United States District Court
Northern District of California